Filed 1/5/15

# IN THE SUPREME COURT OF CALIFORNIA

|                               |     |                        |
|-------------------------------|-----|------------------------|
| THE PEOPLE,                   | )   |                        |
|                               | )   |                        |
|    Plaintiff and Respondent, | )   | S076339                |
|                               | )   |                        |
|    v.          | )   |                        |
|                               | )   |                        |
| GARY LEE GRIMES,              | )   |                        |
|                               | )   | Shasta County          |
|    Defendant and Appellant. | )   | Super. Ct. No. 95F7785 |
| _____  | )   |                        |

Defendant Gary Lee Grimes was convicted by a jury of one count of murder with burglary and robbery special circumstances and one count each of robbery, burglary, conspiracy to commit robbery, conspiracy to commit burglary, and unlawful driving or taking of a vehicle. (Pen. Code, §§ 182, subd. (a), 187, subd. (a), 190.2, subd. (a)(17), 211, 459; Veh. Code, § 10851, subd. (a).)[1] In connection with the murder, robbery, burglary, and conspiracy counts, the jury found true allegations that defendant inflicted great bodily injury upon the victim, an elderly person (§ 1203.09, subd. (a)), and that the offenses were committed while defendant was on parole (§ 1203.085, subd. (b)). In a bifurcated proceeding, the trial court found true allegations that defendant had served four prior prison terms (§ 667.5, subd. (b)) and had been convicted of a serious or violent felony

---

[1] All further statutory references are to the Penal Code, unless otherwise indicated.

within the meaning of the Three Strikes law (§ 1170.12). The jury returned a verdict of death. The trial court sentenced defendant to death for the murder and imposed a term of six years for the driving or taking of a motor vehicle and four one-year terms for the four prior prison term allegations; sentences on the remaining counts were imposed and stayed.

The judgment is modified to vacate the true finding on one of the four prior prison term allegations, and is otherwise affirmed.

## I. FACTS

### A. Guilt phase

#### 1. *The offenses*

In October of 1995, defendant, then 33 years old, was staying with a friend, Sheila Abbott (Sheila), in her trailer. Also staying in the trailer were Sheila's son, Shane Fernalld, her daughter, Misty Abbott (Misty), and Misty's boyfriend, Patrick James Wilson, then 19 years old. On the morning of October 18, John Morris, a 20-year-old friend of the family, arrived at Sheila's trailer. At approximately noon, Morris, Wilson, and defendant obtained some medical gloves and bandanas from the trailer. They tried on the bandanas, placing them over their mouths, before putting them in their pockets. The three left in Morris's red sports car. They drove to the house shared by Betty Bone, who was then 98 years old, and her daughter. They ransacked the house and took property, including a .38-caliber handgun, a "boom box," some jewelry, a rifle, a telephone in a Styrofoam box, and a brown truck.

Bone was killed. Her body showed evidence of blunt force trauma to the head, ligature strangulation, and stab wounds. There was a telephone cord and a bandana around her neck. There was bruising on her tongue and lip that was likely caused by a gag. Her injuries were consistent with her having been knocked

2

unconscious, strangled, and then stabbed repeatedly. Bleeding due to the stabbing was the cause of death, with strangulation as a contributory cause.

Defendant, Wilson, and Morris returned to Sheila's trailer, with Morris and Wilson in Morris's car and defendant driving the brown truck that had been taken from Bone's residence. They unloaded items from the truck. Defendant showed a bag of jewelry to Sheila, and asked her whether it was real; she told him it was costume jewelry. Defendant drove the truck to Shasta Lake, with Morris and Misty following in Morris's car. Defendant drove the truck into the lake. The three left the lake in Morris's car to go back to Sheila's trailer.

Later that afternoon defendant, Morris, and Misty were driving in defendant's brown Camaro when they approached a roadblock that had been set up by the sheriff's department. Before reaching the roadblock, defendant and Morris threw their guns out of the car and into the bushes. The weapons, which included the handgun taken from Bone's residence along with another handgun, were later recovered by law enforcement. When they went through the roadblock, defendant identified himself to an officer as "Gary Woods" and gave the officer a false Social Security number. He was wearing a pair of white fingerless gloves, similar to the type of gloves that Bone's daughter kept in the brown truck.

They returned to Sheila's trailer and then left for Sacramento. Misty and her baby went in Morris's car and defendant drove in his car with Misty's brother, Shane Fernalld. They spent the night in Sacramento with Morris's aunt. In her apartment, they left a bag of jewelry and the box containing a telephone that had been taken from Bone's house. The next day, Fernalld left defendant at the Sheraton apartment complex.

## 2. *Defendant's arrest and statements to police*

Morris was arrested on October 21, 1995, three days after the crime, and killed himself in his jail cell the next afternoon. Wilson was arrested the following day. Also that day, a deputy sheriff recovered two knives that had been buried near Sheila Abbott's property. One was a long kitchen knife and the other was a pocket knife. DNA from both knives was consistent with a mixture of Bone's DNA and Wilson's DNA; none of the DNA on the knives could have come from defendant. Defendant was arrested on the following day, as he pulled his car into the parking area of the Sheraton apartment complex. As he got out of the car, a loaded .22-caliber handgun fell out of the driver's side door. Defendant called Sheila Abbott from jail, and she told him that Morris had killed himself.

Defendant was interviewed by detectives, and a tape recording of the interview was played for the jury. Defendant admitted that he was involved in the burglary and robbery, but denied any involvement in the murder, claiming that Morris had killed Bone while defendant was in the back of the house. Defendant stated that it had been Morris's idea to break into a house because he needed money to pay for his automobile insurance. Defendant said that he, Morris, and Wilson each had a bandana that Sheila had given them, and they had latex gloves that were obtained from her first-aid kit. Morris drove defendant and Wilson to Bone's neighborhood, an area in which defendant had formerly lived. In the car, defendant handed Morris a gun, which was wrapped in a bandana, and Morris put it in his pants. According to defendant, they were watching a house in the neighborhood and saw a woman outside; Morris said they could kill her and take their time going through the house, but defendant told Morris that he was "not into killin' people."

Defendant told the detectives that when they arrived at the Bone house, Morris and Wilson knocked on the door of the house and initially no one

4

answered; Morris commented that no one was there and defendant concluded they would just be committing a burglary. Then Morris stated there was someone in the house. Defendant walked back to the car and saw Bone answer the door. Wilson asked for a girl named Debbie and Bone replied "no, my daughter's name is Barbara." Wilson pushed the door open, hitting Bone and knocking her to the ground. Defendant walked through the open door. At some point he saw Bone lying on the floor with Morris on top of her; Bone pleaded with him to let her go. Defendant told the detectives that he said to Morris, "don't hurt no women, don't hurt nobody." He said he went into the back of the house because he "couldn't deal with it." When he came back out of the bedroom he saw Morris strangling Bone, who was tied up with a phone cord. According to defendant, Morris said, "I can't leave no witnesses." Morris also said, "that fucking bitch won't die." Defendant saw Morris rummaging through the kitchen looking for a knife. He saw or heard Morris stabbing Bone forcefully and repeatedly. Morris gave Wilson a paper sack containing the knives that were later recovered, and told him to get rid of them.

According to defendant, Morris ordered him to take Bone's truck. They loaded the items from the house into the truck and took them back to Sheila's trailer. Wilson and Morris siphoned the gas out of the truck. Defendant drove the truck to Shasta Lake, following Morris and Misty. Morris instructed defendant to break out the windows of the truck and drive it into the lake. Defendant told the detectives that the gun he had when he was arrested in Sacramento did not come from the house and that he had obtained it that same day. He stated that Wilson had found a gun in the house and Morris had found a rifle. Defendant denied knowing the location of the guns taken from the house and asserted that Morris was supposed to dispose of them.

5

### 3. Testimony regarding out-of-court statements

At trial, Misty Abbott testified that during the ride to Shasta Lake, Morris told her that he had killed a woman; specifically, he had tried to strangle her but because she did not die he took a knife from the kitchen and stabbed her. She testified that during the ride back to her mother's trailer, after they dumped the truck into the lake, defendant and Morris fired their guns out the windows of the car. When she was interviewed by Wilson's private investigator, she also said that Morris and defendant were laughing about the murder and calling each other "down white boys." Misty's brother, Shane Fernalld, testified that while he and defendant were driving to Sacramento, defendant told Fernalld either "she deserved it" or "she didn't deserve it"; he was not sure which. Before trial, however, he told several law enforcement officers that defendant's statement was "she deserved it" or "the old bitch deserved it." Morris's grandfather testified that Morris called him from jail, sounding very upset, and told him that his friends had turned against him and were going to testify that he had killed Bone, but that he had not done it.[2] This call occurred an hour or two before Morris committed suicide by hanging himself in his jail cell.

Jonathan Howe, a prisoner who had been housed with defendant in the county jail, testified that defendant told him defendant had ordered Wilson and Morris to tie up Bone and kill her. According to Howe, defendant also told him that he could not be linked to the murder with DNA evidence because he had never touched the body. Defendant told him either that he had enjoyed watching

---

**2** The trial court admonished the jury that it could not consider for its truth Morris's statement to his grandfather that he did not kill Bone; the court explained that testimony was relevant only in evaluating Misty's testimony regarding Morris's confession to him.

Bone be killed or he enjoyed the fact that she died. Howe testified under an agreement that permitted him to plead guilty to pending charges for a sentence of, at most, 24 months, consecutive to a term he was already serving. Prior to coming forward he had been offered a plea bargain with a 24-month consecutive sentence. Under the new plea agreement, he could receive a sentence of less than 24 months; his sentencing was postponed until after trial in the present case, at which time the judge presiding over defendant's trial would decide his sentence.

### 4. Defense evidence

Defense counsel conceded that defendant was guilty of burglary, robbery, and murder, but contested the special circumstance allegations on the grounds that defendant was not the actual killer and did not act with an intent to kill or a reckless indifference for life.

The defense put into evidence admissions made by Wilson to law enforcement officers that were consistent with defendant's statements to the police regarding Wilson's role: Wilson admitted that he was involved with the burglary and that he had pushed Bone inside the house; when she fell back she was knocked out and he watched her for several minutes; he found a .38-caliber revolver in a toolbox in a closet in Bone's house; he cleaned the knives used to kill Bone by spitting on them and wiping them off with a cloth; he siphoned gas out of the truck before defendant drove it to the lake.

Evidence was also presented that the day after Morris was arrested, he called Sheila Abbott's trailer and asked her daughter, Ginger Abbott, if she could provide him with an alibi. Ginger refused.

The jury convicted defendant on all counts.

7

## B. Penalty phase

### 1. *Aggravation*

The prosecution introduced evidence that after driving the truck into the lake, defendant, Morris, and Misty Abbott bought some methamphetamine and injected it. Defendant had 10 prior felony convictions. The prosecution presented evidence regarding four incidents involving violent criminal conduct. In 1985, defendant, along with accomplice Anna Cline, tied up victim James Leonard and stole $300 from him. Defendant brandished a pipe that was wrapped in a towel to simulate a gun. Afterward, defendant and Cline used the money to purchase drugs. A day after that robbery, defendant was observed by a police officer shooting a sawed-off shotgun in an orchard. In 1991, a police officer encountered defendant in a restaurant with a loaded .25-caliber semiautomatic handgun in his waistband. In 1993, during a fight with his girlfriend, defendant held her down in his car by her throat, threatening to choke her if she left him. When he stopped the car in a parking lot, she escaped, he ran after her, and they struggled until police arrived.

### 2. *Mitigation*

The defense case in mitigation focused on two themes: defendant's cognitive impairments and his positive contributions to his friends and family members. A neuropsychologist, John Wick, testified about the results of psychological testing. Defendant's mental functioning was tested in 12 areas; his scores were in the mentally retarded range in seven areas, low dull-normal in two areas, and normal in three areas. Defendant's overall IQ score was 73, which is borderline retarded, and he generally tested in the range of third to fourth grade in reading, spelling, and arithmetic. Wick concluded that defendant had organic brain damage and that his low intellect could impair his judgment, cause

8

impulsivity, make decisionmaking difficult, and make it difficult to learn both academic subjects and acceptable social behaviors.

Psychiatrist Albert Globus, who interviewed defendant and reviewed the test results, agreed that defendant was mentally retarded. Dr. Globus thought that defendant suffered from organic brain damage at birth (possibly due to beatings his mother suffered while pregnant), based on the test results and on his low birth weight, trouble breast feeding, loss of weight during his first week of life, incontinence up to the age of eight, and a speech impediment. At age 12, he suffered a serious head injury which may have exacerbated his brain disorder. Although defendant could determine right from wrong, Dr. Globus concluded that he would have difficulty applying that knowledge to his decisionmaking and would likely rely on others to make decisions for him. People like defendant will often function better in a structured setting like prison because most decisions are made for them.

At age nine, defendant was referred to a psychiatrist, who prescribed Ritalin and Librium. At age 11, he was placed in special education classes for emotionally disturbed children. Defendant's special education teacher, a teacher's aide, and a resource specialist for the special education program described defendant, at that time, as nonaggressive, well behaved, a follower, and someone in need of love and attention. At age 15, he began running away from home and was placed in foster care and then juvenile hall. He was committed to Napa State Hospital at age 17 for nine months. His records from the hospital indicate he was mildly mentally retarded and had latent schizophrenia.

Defendant's sister, Darlene, testified that when defendant was a young boy he was incontinent and their mother would make him wear a dress and stand out in the yard as punishment. Defendant lacked self-esteem and confidence; she described him as a follower who would do what others told him to do.

9

Defendant's mother, Patricia Grimes, testified that she loved her son. Defendant's father beat her while she was pregnant and left her before defendant was born. After the birth, she was in the hospital for more than three months with postpartum depression and defendant lived with her parents. She recalled that at a young age, he told her he heard voices and he would wake in the night screaming. Defendant's mother also testified that the day before he was arrested, he was crying and remorseful, and said he was very sorry that the victim had died.

Defendant's ex-wife, Cindy Grimes, who was married to defendant in 1990 for a brief period, testified that she loved him and he had treated her and her teenage son well. Defendant also helped take care of her father, who was disabled. Her son, Michael, testified that defendant treated both of them very well, and had influenced him to get his GED and stay out of trouble with the law. Cindy's mother and the manager of their apartment complex confirmed that defendant was helpful and kind to Cindy's family and to others who lived in their apartment complex. A fellow prison inmate, Michael Huntsman, testified that defendant came to his aid when he was assaulted by a group of inmates.

In 1995, defendant attempted to assist the mother of his fiancée, Shannon Yarnell, in a domestic violence incident involving Shannon's stepfather. The incident ended in tragedy, however, when Shannon's stepfather rammed his truck into the car in which Shannon was riding, killing Shannon.

## II. DISCUSSION

### A. Excusal for cause of Prospective Juror A.J.

Defendant contends that the death sentence must be reversed because the trial court erred in excusing for cause Prospective Juror A.J. The trial court concluded that A.J. would have difficulty following the law on felony murder in a case in which the defendant did not actually kill or intend to kill. As explained in

10

more detail below, Prospective Juror A.J. indicated in his questionnaire that if his conscience conflicted with the law, he would follow his conscience. Although he stated during voir dire that if he were sworn as a juror he would follow the law, he also made clear that the law making a defendant liable for felony murder and a special circumstance would present an extreme conflict for him if the defendant did not intend to kill, and that he would prefer not to be in that situation. We conclude that the trial court did not err in granting the prosecution's challenge for cause.

On his questionnaire, Prospective Juror A.J. responded to a query about how he would deal with a situation in which the law differed from his beliefs or opinions by stating, "If it were a moral issue I would opt for my conscience. Otherwise I would do my duty in accordance with the law." In response to another question, he affirmed that he could set aside his personal feelings regarding what the law should be and follow the law as explained by the court.

The court began voir dire by noting these responses and explaining that, as a juror, A.J. would have to agree to put aside his views and follow the law. Asked if he could make that agreement, A.J. responded, "I think so." Asked if he had some particular concern about a moral belief that might conflict with the law, he responded that he did not know what might occur. The court noted that when asked on the questionnaire whether, concerning the issue of penalty, he would limit himself to considering only those factors enumerated by the court, he had written, "If I must, yes." A.J. explained that when answering that question he had been thinking that there might be a conflict between the law and his moral judgment.

The court explained that no one knew exactly what the evidence at trial might be, and that jurors are asked to take an oath that if a conflict arises between their personal views and the law, they would set aside their views and follow the

11

law.  The court stated it needed to know whether, if there was a conflict, A.J. would follow his conscience and not follow the law.  A.J. responded, "At this time, I don't know whether that situation would arise; therefore I would say, having to answer your question, I would say that I would set aside in order to follow my duty as a juror."  A.J. affirmed that he could "be an impartial juror who will faithfully apply the law in this case."

When defense counsel questioned him, counsel commented that A.J. had hesitated every time that he answered a question about his ability to follow the law.  Counsel asked what personal feelings he might have that might interfere with his ability to follow the law.  A.J. responded that he had never been a juror before. When defense counsel asked whether A.J.'s hesitation had anything to do with this being a capital case, A.J. responded, "No doubt that has something to do with it, also."  He added, "I'm a person who is directed by my conscience.  Now, if I promise, through an oath, to set that aside, I will certainly do my duty . . . I don't know if the situation — the specific situation will . . . arise where I will be in conflict.  But as I said, . . . if I make an oath, say I will set that aside, that will be my primary responsibility."

During a break, the court expressed its "ongoing concern about this juror's potential conflict . . . whether or not he can honestly make the commitment to follow the law regardless of a possible conflict."  The court encouraged the prosecutor to question the prospective juror on this issue.  The prosecutor asked A.J. about his views on the death penalty and A.J. stated that he "could apply it as a juror" and affirmed that he had no concerns about it in relation to his conscience or his moral beliefs.

The prosecutor later explained the felony-murder rule and provided a hypothetical in which two former employees of a grocery store burned the store down at night, hoping that no one would be working at that time.  One supplied

12

the gasoline and drove the two to the store, and the other lit the fire. The prosecutor asked whether A.J. could follow the law that both would be liable for murder. A.J. responded that he could not, because in the hypothetical there was "no intention to kill." A.J. promptly clarified, however, that if he had been sworn in as a juror to follow the law, he would do so "regardless of what my conscience says." He explained that he did not agree with the law in the hypothetical described by the prosecutor, but if sworn in as a juror he would "follow the law as explained to me by the court." When further pressed by the prosecutor about whether he could follow the law that the man who drove the car in the scenario would be liable for murder "even though he had no intention to kill and he was not the actual killer," A.J. stated that he would follow the law but "I prefer not to be in that situation. . . . But if I place myself in that situation and I said to the court, yes, you swear me in, I will follow the law."

The prosecutor then explained that the person in the hypothetical who drove the car could be liable for a special circumstance "if the jury finds that he acted as a major participant and with a reckless indifference to human life." The prosecutor asked whether A.J. could follow the law making that person guilty of the special circumstance. His initial answer was "no." The trial court interrupted and explained that although the facts of the hypothetical were not those of the present case, he should assume that they might equally put him in a situation in which the law was in conflict with his conscience. The court asked whether he could take the oath. A.J. responded, "I am telling you that if I was sworn to uphold the law as stated to me, I would do so." In response to another question, he reiterated that if he was a juror and "I had taken an oath to uphold the law as stated to me, I would do so." He added, however, referring to the discussion about the prosecutor's hypothetical, "I would very much prefer not to be in that situation because of the extreme conflict that would occur."

13

The prosecutor challenged A.J. for cause. Defense counsel disagreed, and opined that the prosecutor's hypothetical was misleading. The trial court excused Prospective Juror A.J. for cause. The court stated that it had "more than a definite impression" that the juror would be unable to apply the law if his views conflicted with it. The court noted that although the prosecutor's hypothetical did not reflect the circumstances of the present case, "a key circumstance which could conceivably be before this juror is somebody who is being considered for punishment by the jury who did not preplan and did not intend to murder and who was convicted under the felony-murder rule, and I think this juror has an extreme conflict in that area, and I also have a definite impression that in spite of what he said, this juror would have difficulty and probably be unable in any case of a serious conflict between his personal views and the law to faithfully follow the law."

A capital defendant's Sixth and Fourteenth Amendment right to an impartial jury prohibits the exclusion of prospective jurors "simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction." (*Witherspoon v. Illinois* (1968) 391 U.S. 510, 522.) A prospective juror may be excused from serving in a capital case, however, if his views on the death penalty would " 'prevent or substantially impair' " the performance of his duties as a juror. (*Wainwright v. Witt* (1985) 469 U.S. 412, 424 (*Witt*).) "A prospective juror who would invariably vote either for or against the death penalty because of one or more circumstances likely to be present in the case being tried, without regard to the strength of aggravating and mitigating circumstances, is . . . subject to challenge for cause, whether or not the circumstance that would be determinative for that juror has been alleged in the charging document." (*People v. Kirkpatrick* (1994) 7 Cal.4th 988, 1005; see *People v. Livaditis* (1992) 2 Cal.4th 759, 772 [juror who was unwilling to impose

14

the death penalty on a defendant who was young and had not previously killed was properly excused]; *People v. Pinholster* (1992) 1 Cal.4th 865, 916-918 [trial court properly excused prospective jurors who could not consider the death penalty in a case involving an unplanned killing during a burglary but could consider it in other situations, including if the murder were premeditated]; see *People v. Fields* (1983) 35 Cal.3d 329, 357-358 [court may exclude jurors who would automatically vote against the death penalty in the case before them, even if they were willing to consider the death penalty in other cases].) " ' "[O]n appeal, we will uphold the trial court's ruling if it is fairly supported by the record, accepting as binding the trial court's determination as to the prospective juror's true state of mind when the prospective juror has made statements that are conflicting or ambiguous." ' " (*People v. Jenkins* (2000) 22 Cal.4th 900, 987.)[3]

We have held that a prospective juror's statements that he or she would have a " 'hard time' " voting for death or would find it " 'very difficult' " to do so "indicate a degree of equivocation on the juror's part which, taken into account with the juror's hesitancy, vocal inflection, and demeanor, can justify a trial court's" excusal of the juror under the *Witt* standard. (*People v. Roldan* (2005) 35 Cal.4th 646, 697.) Here, substantial evidence supports the trial court's conclusion that A.J. would have difficulty following the law if faced with deciding the punishment for a defendant convicted of felony murder who did not intend to kill. Beginning with the questionnaire, A.J. consistently expressed concern about his ability to follow the law if it conflicted with his moral views. Voir dire revealed

---

[3] We have previously rejected defendant's argument, based on *Greene v. Georgia* (1996) 519 U.S. 145, that we need not give deference to the trial court's findings related to juror bias, concluding that California law on this point is settled. (*People v. Farnam* (2002) 28 Cal.4th 107, 132.)

15

that his personal views were in "extreme conflict" with the law making a felony murderer guilty of first degree murder and eligible for the death penalty even if he did not intend to kill. Although A.J. insisted that he would follow his oath as a juror if sworn, he stated that he preferred not being placed in the position of having to do so. The trial court noted that it had the "definite impression" that A.J. would be conflicted despite his promise to follow the law. Under these circumstances, we defer to the trial court's conclusion that he would be unable to follow the law if it seriously conflicted with his views.

### B. Excusal for cause of Prospective Juror J.W.

Defendant similarly argues that his death sentence must be reversed because Prospective Juror J.W. was erroneously excused for cause. The trial court excused J.W., over objection by defense counsel, because it concluded he would not be able to fairly consider the death penalty in a case in which the defendant did not intend to kill. Defendant contends the trial court erred because the juror's answers indicated that his views were consistent with the law. We disagree.

In his questionnaire, J.W. responded to the question about what he would do if the law differed from his beliefs or opinions by writing, "The law has to be." Although he indicated he did not always agree with the law, he wrote: "The law is not always right. But it is the law." He did not have strong feelings about the death penalty; he did not like it, "[b]ut it has[] to be." He wrote that he could follow the court's instructions regarding the factors to be considered in deciding between a sentence of death and life without the possibility of parole, and that he could set aside his personal feelings about what the law should be and follow the law as the court explained it.

The trial court began voir dire by questioning J.W. about his attitudes regarding the death penalty and life without the possibility of parole. J.W.

16

affirmed that if the law and facts justified it, he would be capable of voting for either punishment. He felt that life imprisonment was the more severe punishment, but could accept that the law regarded death as the more severe punishment. He affirmed that if his personal views conflicted with the law, he could follow the law.

In response to questioning from the prosecutor, J.W. stated that he would favor life in prison over death for most people but he would apply the law. He was sure that he could "make . . . a proper decision." The prosecutor explained the felony-murder rule, including the same hypothetical she had used previously with Prospective Juror A.J. regarding two accomplices who commit arson of a store at night ("thinking, hoping, praying nobody's there"), resulting in the death of a clerk who was working late. J.W. agreed that both people in the hypothetical — the one who drove the car and the one who set the fire — were equally responsible for the death even though they did not intend the person to die, but stated that in that scenario, "I would go for life in prison without parole." He explained that had they known the clerk was there, however, "that would be a different circumstance and that might be a death sentence." He affirmed that he could follow the law that makes a person guilty of murder "even though they didn't have any intention to kill and they were not the actual killer."

The prosecutor then explained that a person could be eligible for the death penalty "even though they're not the actual killer and they had no intention to kill," if they "act as a major participant in an underlying felony and they act with a reckless indifference to human life." When asked whether his personal beliefs would prevent him from being able to "seriously consider the death penalty in that situation," J.W. responded "I'm sure I could follow the law." The prosecutor then asked whether J.W. would have a "hard time giving serious consideration to the death penalty in that situation." J.W. stated that "if a person accidentally killed

17

somebody, it would be hard to give them the death penalty. If a person deliberately killed somebody, then it's a different scenario." When the prosecutor asked again whether J.W. could really set aside his moral principles, he responded, "I would do it. . . . I know, that's a hard one. I would do it."

The prosecutor continued to pursue the point, asking, "In the situation where someone doesn't have any intention to kill, do you feel that you could seriously consider the death penalty?" J.W. responded, "If a person flat had no intention to kill . . . it would be hard to give them the death penalty. I don't know that I would, but I don't know that I wouldn't." J.W. then attempted to explain his position with a hypothetical. "[I]f someone was robbing a bank and they had a gun and a guard pulled his gun out and he shot the guard, that's intentionally killing him. If somebody was robbing a bank and somebody had a heart attack — and I believe under the law, he's in for murder there. No, that — that wasn't an intentional killing. . . . That would be the life in prison instead of the death penalty." The prosecutor then asked whether J.W. felt it necessary to have an intent to kill in order to receive the death penalty. J.W. responded, "Yes, I do. I may not have noticed that when I came in here, but now that we've talked." He affirmed that it would be hard for him to personally vote for the death penalty if there was no intention to kill, and then clarified, "If there was no intention [to] kill, then I don't think that a person should have the death penalty."

The prosecutor rephrased the question, asking whether J.W. could not impose the death penalty unless the defendant intentionally killed the victim, even if the defendant had been convicted of first degree murder and a special circumstance. J.W. then questioned whether a person could be convicted of first degree murder if the person had not intentionally killed, stating that he did not know the law. The trial court interjected, explaining that "somebody can be convicted of first degree special circumstance murder even though that person did

18

not personally kill the victim and even though that person did not have an intent to kill." The court stated that it could not go into the specifics of this case, but "[w]e're talking in a hypothetical case [the prosecutor] gave you." "But the law says that persons can be convicted of a first degree special circumstance murder such that the jury would be called upon to decide which of those two punishments, death or life without parole, was appropriate in a case where the defendant did not have the intent to kill anybody. If a person was killed, for example, in the course of one of the special — specified felonies, it was a felony-murder rule, and all the other criteria that the attorneys have mentioned. That's the law." The court then asked whether J.W. could follow the law and whether he could honestly consider all the circumstances in aggravation and mitigation before he decided the penalty. J.W. responded, "no, my mind would not be made up that I would not vote for the death penalty."

The court then rephrased the question, asking whether there was "some absolute requirement, factually, regarding an intent to kill before you would ever vote for the death penalty, no matter what the other evidence was?" J.W. responded, "Let me put it this way? If I — I thought that a person never intentionally killed somebody, I would have trouble voting for the death penalty, yes." The court again rephrased the question, asking whether he would "have trouble giving any serious consideration" to the penalty phase evidence, "you kind of have your mind made up already?" J.W. responded, "If he didn't deliberately kill somebody or she, then I would have trouble giving the death sentence. If they killed somebody, breaking the law or whatever, you know, and it was an accident or whatnot, no, then they go to jail for the rest of their life or whatever."

The prosecutor challenged J.W. for cause. Defense counsel responded that the questioning did not explain the requirement of major participation in the felony and an indifference to human life, and the juror did not really understand that law.

19

Defense counsel observed that the prospective juror's hypothetical demonstrated that he was thinking about an accident, someone who had a heart attack during a bank robbery. Accordingly, defense counsel argued, the juror was confused and did not have the whole picture

The court stated it was ready to rule, and granted the challenge to exclude for cause. The court stated that J.W. had "a predisposition to favor life without possibility of parole and to reject the death penalty such that . . . he would basically be precluded or, at the very least, appreciably impeded from engaging in the weighing process that the law requires in the second phase." The court thought that "this juror, ultimately, after all examination, understood that under the law, somebody could be convicted of first degree murder and eligible for consideration for the death penalty without an intent to kill, felony-murder rule was explained, both sides had the opportunity to do that. And I think this juror made it as clear as he could that if there was not an intent to kill, or a deliberate killing, he wouldn't be able to vote for the death penalty or there was no reasonable possibility of that."

As noted above, even if a prospective juror could fairly consider imposing the death penalty in some types of cases, one "who would invariably vote either for or against the death penalty because of one or more circumstances likely to be present in the case being tried, without regard to the strength of aggravating and mitigating circumstances, is . . . subject to challenge for cause." (*People v. Kirkpatrick* (1994) 7 Cal.4th 988, 1005.) " ' "[O]n appeal, we will uphold the trial court's ruling if it is fairly supported by the record, accepting as binding the trial court's determination as to the prospective juror's true state of mind when the prospective juror has made statements that are conflicting or ambiguous." ' " (*People v. Jenkins, supra,* 22 Cal.4th at p. 987.) "If there is no inconsistency . . . we will not set aside the court's determination if it is supported by substantial

20

evidence and hence is not clearly erroneous." (*People v. Cooper* (1991) 53 Cal.3d 771, 809.)

J.W.'s statements regarding his ability to consider a death sentence for someone who did not intend to kill were conflicting. J.W. stated that he would have trouble voting for the death penalty if the person did not intend to kill. After the prosecutor explained the law that makes a person eligible for the death penalty "even though they're not the actual killer and they had no intention to kill," so long as the person acted "as a major participant in an underlying felony and . . . with a reckless indifference to human life," J.W. stated clearly that he would be able to follow the law. However, he then indicated that "If a person flat had no intention to kill . . . it would be hard to give them the death penalty." J.W. affirmed that he felt it was necessary to have an intent to kill in order to receive the death penalty. When the judge rephrased the question, he stated that his mind would not be made up against the death penalty. Yet when the judge asked him whether there was "some absolute requirement" of an intent to kill before he could impose the death penalty, J.W. repeated, "If he didn't deliberately kill somebody or she, then I would have trouble giving the death sentence." Because Prospective Juror J.W.'s statements were conflicting and ambiguous, we must accept the trial court's determination regarding his true state of mind. (See *People v. Jenkins, supra,* 22 Cal.4th at p. 987.)

Defendant contends that J.W.'s answers were not conflicting and his views were consistent with the law. Only one of the questions he was asked specifically mentioned a defendant who did not intend to kill but who also exhibited a reckless disregard for life. In response to that question, he stated that he could follow the law. The other questions he was asked referred to a defendant who did not intend to kill, but said nothing about a reckless disregard for life. Thus, defendant argues, J.W.'s statements that he would have difficulty imposing a death sentence on a

21

defendant who did not intend to kill do not indicate he would have the same difficulty with a defendant who acted with reckless disregard for life. This conclusion is further supported, defendant contends, by the circumstance that J.W. consistently explained that his difficulty was with imposing the death penalty for an "accidental" killing, demonstrating that he did not understand the questions concerning an unintentional killing to include a killing committed with "reckless disregard for life."

Defendant's interpretation of J.W.'s remarks is one reasonable interpretation of the record. It is not, however, the only reasonable interpretation of the record, and "the question is not whether a reviewing court might disagree with the trial court's findings, but whether those findings are fairly supported by the record." (*Witt, supra*, 469 U.S. at p. 434.) The trial court could fairly conclude, taking into account not only J.W.'s words but also his demeanor, that his references to accidental killings were just one example of the circumstances in which he would have difficulty imposing the death penalty. And because J.W. had been informed about the "reckless indifference to life" requirement, the trial court could fairly conclude that he understood the law and could interpret his continued statements that he would have a problem imposing the death penalty for an unintentional killing to encompass killings that were committed with a reckless disregard for life.

## C. Trial court's refusal to impanel separate juries for the guilt and penalty phases

Defendant contends the trial court erred in refusing to impanel separate juries for the guilt and penalty phases. In support of his motion for separate juries, defendant presented a transcript of the testimony of Professor Edward Bronson, of Chico State University, in another case. Professor Bronson testified that the process of death qualification is prejudicial to a defendant in two ways. First, the

22

remaining jurors who are not eliminated tend to be less supportive of due process values than those who were eliminated. Second, the process of death qualification, by focusing on the death penalty and asking jurors to put themselves in the position of having found defendant to be guilty, suggests to jurors that the defendant is guilty and that their duty is to find him guilty, and it may also desensitize them to their task. According to Professor Bronson, sequestered voir dire would "to some extent, minimize or mitigate those effects," but would not eliminate them. The trial court denied defendant's motion, concluding that much of the potential prejudice resulting from death qualification could be avoided if the court used individual, sequestered voir dire and if the court and counsel were careful to impress upon the potential jurors that defendant's guilt was not a foregone conclusion.

Section 190.4, subdivision (c), requires the same jury to decide guilt and penalty absent good cause. We review the trial court's decision for abuse of discretion. (*People v. Bivert* (2011) 52 Cal.4th 96, 108.) Dr. Bronson's testimony supported only the conclusion that death-qualified juries *in general* tend to be more likely to convict. "This court and the United States Supreme Court have repeatedly rejected the claim that separate juries are required because jurors who survive the jury selection process in death penalty cases are more likely to convict a defendant." (*People v. Davis* (2009) 46 Cal.4th 539, 626; see *Lockhart v. McCree* (1986) 476 U.S. 162; *Hovey v. Superior Court* (1980) 28 Cal.3d 1, 68-69.) Nothing in Dr. Bronson's testimony or the studies he cited provided any information significantly different from that which was considered in our previous decisions. Indeed, Dr. Bronson testified that studies undertaken after *Lockhart* and *Hovey* reached conclusions similar to those of the studies addressed in those cases and he was not able to cite any significant new developments in the research. Thus, Dr. Bronson's testimony provided no basis for the trial court to depart from

23

the holdings in these prior cases. Defendant offered no evidence to establish good cause for a separate penalty jury based on the particular circumstances of this case. The trial court took steps to reduce any prejudice to defendant that might result from the jury selection process, including conducting individual, sequestered voir dire. We find no abuse of discretion.

### D. Exclusion of Morris's alleged statements against interest

As noted above, witness Misty Abbott testified that Morris told her he killed the victim, first attempting to strangle her and then, because she did not die, taking a knife from the kitchen and stabbing her. This statement was admitted as a declaration against Morris's penal interest. (Evid. Code, § 1230.) The defense also sought to admit additional statements by Morris as declarations against interest: (1) testimony by Misty Abbott that Morris told her defendant did not take part in the killing and that after he "did the lady" defendant and Wilson "looked at [Morris] as if they were saying, what in the hell are you doing, dude"; and (2) testimony by Albert Lawson that while he was incarcerated in the county jail, Morris told him that defendant and Wilson were "in the house but took no part in the actual killing." The trial court ruled that these statements were inadmissible hearsay because they did not qualify as declarations against interest under Evidence Code section 1230. Defendant contends that the trial court erred in excluding these statements and that the trial court's ruling violated his Fifth Amendment right to a fair trial, his Sixth Amendment right to present a defense, and the Eighth Amendment's requirement of reliable procedures in death penalty cases. (*Crane v. Kentucky* (1986) 476 U.S. 683; *Chambers v. Mississippi* (1973) 410 U.S. 284, 302.)

24

### 1. Applicable legal principles

There is an exception to the rule excluding hearsay for a statement against interest — that is, one that "when made, was so far contrary to the declarant's pecuniary or proprietary interest, or so far subjected him to the risk of civil or criminal liability, or so far tended to render invalid a claim by him against another, or created such a risk of making him an object of hatred, ridicule, or social disgrace in the community, that a reasonable man in his position would not have made the statement unless he believed it to be true." (Evid. Code, § 1230.) This exception to the hearsay rule is "founded on the assumption that a person is unlikely to fabricate a statement against his own interest at the time it is made." (*Chambers v. Mississippi, supra,* 410 U.S. at p. 299.) "The proponent of such evidence must show that the declarant is unavailable, that the declaration was against the declarant's penal interest when made and that the declaration was sufficiently reliable to warrant admission despite its hearsay character." (*People v. Duarte* (2000) 24 Cal.4th 603, 610-611 (*Duarte*).)

We review a trial court's ruling as to whether a statement is admissible as against a declarant's penal interest for abuse of discretion. (*People v. Lawley* (2002) 27 Cal.4th 102, 153 (*Lawley*).) "In determining whether a statement is truly against interest within the meaning of Evidence Code section 1230, and hence is sufficiently trustworthy to be admissible, the court may take into account not just the words but the circumstances under which they were uttered, the possible motivation of the declarant, and the declarant's relationship to the defendant." (*People v. Frierson* (1991) 53 Cal.3d 730, 745 [trial court did not abuse its discretion in excluding statement of third party that he had killed the victim, where the statement was made 14 years after the murder and before defendant's retrial on special circumstances and penalty, the declarant knew there had been a prior verdict finding that defendant was the killer, and the trial "court

25

could reasonably find [the declarant] wanted to aid his friend at little risk to himself"].)

Evidence Code section 1230's exception to the hearsay rule is "inapplicable to evidence of any statement or portion of a statement not itself specifically disserving to the interests of the declarant." (*People v. Leach* (1975) 15 Cal.3d 419, 441.) Even when the declarant admits culpability for a crime, those portions of the declarant's statements that do not incriminate the declarant are inadmissible. For example, in *Lawley*, *supra*, 27 Cal.4th at page 154, we concluded that portions of a declarant's hearsay statement that did not specifically incriminate the declarant were inadmissible. In that case, the defendant was convicted of murder based on evidence that he hired one Seaborn to kill the victim. We held that the trial court did not err in admitting Seaborn's hearsay statement that he was hired to and did kill the victim, while excluding his hearsay statements that he had been hired by the Aryan Brotherhood and that an innocent man was in jail for the crime. The latter two statements, we observed, did not specifically disserve Seaborn's interests.

Whether or not a statement is against penal interest can be determined only by considering the statement in context. (*Lawley*, *supra*, 27 Cal.4th at p. 153.) There are some circumstances in which a declarant's statement that fully or partially exculpates the defendant while placing the greater part of the blame on the declarant have been held to be sufficiently against the declarant's interests to be admissible. In *United States v. Paguio* (9th Cir. 1997) 114 F.3d 928 (*Paguio*), the defendants were a husband and wife who were charged with making false statements on a loan application. (*Id*. at p. 929.) The defendants' lawyer and his paralegal offered to testify concerning statements made by the husband's father, who was a fugitive at the time of trial. (*Id*. at p. 931.) They would have testified that the husband's father stated that " 'he was the one who was involved with

26

creating the false W-2's. He said his son had nothing to do with that.' " (*Id.* at p. 931, fn. 1.) The appellate court held that the trial court erred in excluding the evidence as not sufficiently against interest: "In context, the father's statement that his son had nothing to do with it was inculpatory of the father as well as exculpatory of the son. The father admitted not only participation but leadership, leading his son and daughter-in-law into the abyss. Because leading others into wrongdoing has always been seen as especially bad, there is a sentencing enhancement for it. [Citation.] Also, in context, the inculpating and exculpating statements were not practically separable." (*Id.* at pp. 933-934; see *United States v. Lopez* (10th Cir. 1985) 777 F.2d 543, 554 [trial court erred in excluding hearsay statements of a passenger in a vehicle that he alone had placed cocaine into the vehicle and that the defendant was not aware of the drugs prior to transporting them].)

In *Lawley,* we distinguished *Paguio* in a footnote, noting that in *Lawley*, "the reference to some unidentified 'innocent man' being in jail for the murder did not further incriminate [the declarant]." (*Lawley*, *supra,* 27 Cal.4th at p. 155, fn. 21.) The question, then, is whether portions of a declarant's statements exonerating the defendant further incriminate the declarant; that is, whether they are "specifically disserving to the interests of the declarant." (*People v. Leach*, *supra*, 15 Cal.3d at p. 441.)

In excluding the proffered hearsay, the trial court reasoned that "if somebody is confessing to a murder and to personally being the one who stabbed someone, that it does not in any way significantly enhance the personal detriment to the confessor if he says nobody else had any part in it. . . . [T]he fact that the others did or did not assist him isn't going to diminish his exposure, his public ridicule, et cetera." The trial court found *People v. Gatlin* (1989) 209 Cal.App.3d 31 (*Gatlin*) to be controlling.

27

The trial court may have been incorrect in its categorical statement that a declarant who has admitted to murder does not enhance his personal culpability by claiming that he acted alone. It is plausible that under some circumstances, as defendant contends, such statements may subject the declarant to a risk of increased criminal liability by establishing aggravating circumstances of the crime under section 190.3, factor (a), which would make the declarant more deserving of the death penalty. (See *People v. Carpenter* (1997) 15 Cal.4th 312, 414-415 [that defendant acted alone could be considered by jury as a circumstance of the crime in determining penalty]; *People v. Howard* (1992) 1 Cal.4th 1132, 1195 [defendant's role as the actual killer and motivating force behind the crime was a factor aggravating his culpability].)

Although the trial court relied on *Gatlin*, *supra*, 209 Cal.App.3d 31, that case is not on point. In *Gatlin*, the defendant was charged with burglary and sought to offer recordings of statements made by three codefendants. The codefendants claimed the defendant "had nothing to do with [it]." (*Id.* at p. 44.) However, the codefendants made these statements while disclaiming their own involvement. (*Ibid.*) The Court of Appeal held that the exculpation of the defendant was "not specifically disserving" (*ibid.*) and that the defendant's argument ignored the declarants' "self-serving" (*id.* at p. 43) denials of culpability. Thus, in *Gatlin*, the declarants' exoneration of the defendant clearly did not suggest that the declarants were more culpable. Here, in contrast, Morris's statements were made during a conversation in which he admitted that he personally murdered the victim by choking and stabbing her.

Nevertheless, "we review the ruling, not the court's reasoning and, if the ruling was correct on any ground, we affirm." (*People v. Geier* (2007) 41 Cal.4th 555, 582.) Below, we apply these principles separately to the portion of the

28

proffered statements by Morris describing defendant's reaction to the killing and those portions asserting that defendant did not take part in the killing.

### 2. *Statement regarding defendant's reaction to the killing*

We conclude that the trial court did not abuse its discretion in excluding the portion of Misty Abbott's proposed testimony that Morris told her that after he killed Bone, defendant and Wilson looked at him "as if they were saying, what in the hell are you doing, dude." It was defendant's burden to establish that Morris's statement describing defendant's reaction to the killing "when made, . . . so far subjected [Morris] to the risk of civil or criminal liability . . . that a reasonable man in his position would not have made the statement unless he believed it to be true." (Evid. Code, § 1230; see *Duarte, supra*, 24 Cal.4th at pp. 610-611.)

Defendant contends this portion of Morris's statement qualifies as a statement against interest because it meant that defendant was surprised that Morris killed the victim and thus that Morris alone made the decision to kill, a circumstance of the crime that could have aggravated Morris's potential sentence. The statement, however, was not necessarily against Morris's interest when made because its significance was unclear. Morris's description of defendant's look as signifying "what in the hell are you doing" suggests that Morris thought defendant was surprised or alarmed, but not *why* he was surprised or alarmed. Defendant might have reacted as described by Morris for any number of reasons — for example, because of the manner in which Morris killed the victim or because of the extreme efforts (both strangling and stabbing) he had taken to kill the victim. If defendant's reaction was due to the circumstances, and not the fact, of the killing, the statement did not imply that defendant was unaware that Morris was going to kill the victim or that defendant was not involved in the decision to kill. If so, it did not further incriminate Morris, who had described the circumstances of

29

the crime to Misty, telling her that he had personally choked and stabbed the victim.

In light of defendant's own statements to police, defendant's theory that the reaction described by Morris meant that defendant was surprised at the fact that Morris had killed the victim is an unlikely interpretation. Defendant told the police that he had observed Morris strangling Bone and heard Morris say that she "won't die." Later he saw Morris looking for a knife in the kitchen and then saw or heard him stabbing Bone. Under these circumstances, he could not have been surprised at the fact that Morris had killed Bone. Because Morris's proffered statement was vague and subject to reasonable interpretations that did not further incriminate Morris, the trial court did not abuse its discretion in concluding that defendant failed to establish that the statement was one that "a reasonable man in [Morris's] position would not have made . . . unless he believed it to be true." (Evid. Code, § 1230.)

*3. Statements that defendant did not participate in the killing*

Whether the proffered testimony that defendant did not participate in the actual killing should have been admitted presents a closer question. On the one hand, as defendant contends, we have recognized that a defendant's role as the actual killer and motivating force behind a murder can be an aggravating factor. (*People v. Howard*, *supra*, 1 Cal.4th at p. 1195.) Statements indicating that the declarant was the sole killer could subject the declarant to a risk of increased criminal liability by establishing aggravating circumstances of the crime. On the other hand, given that Morris had admitted that he was the actual killer, and had personally choked and stabbed the victim to death, it is not clear that his statements that defendant was in another part of the house and "took no part in the actual killing" further incriminated Morris to such an extent that a reasonable person in his position would not have made the statements unless they were true.

30

However, we need not decide whether the trial court erred, or whether any such error violated defendant's constitutional rights, because, as explained below, we conclude that the exclusion of Morris's statements regarding defendant's lack of participation in the killing was harmless beyond a reasonable doubt.

### 4. *Attorney General's failure to timely brief the harmless error issue*

The Attorney General did not argue, in her answer brief, that any error in the exclusion of Morris's hearsay statements was harmless. The issue was discussed at oral argument, after which we gave both parties the opportunity to brief the issue of harmless error. In addition, although defendant did not argue in his reply brief that the Attorney General had forfeited the harmless error issue by failing to brief it, we also gave both parties the opportunity to address the question of forfeiture. We conclude that the Attorney General's failure to respond to defendant's harmless error argument does not relieve this court of its responsibility to determine whether any error was harmless.

A forfeiture is the loss of a right by the failure to make a timely assertion of it. (*Cowan v. Superior Court* (1996) 14 Cal.4th 367, 371.) When an appellant fails to raise an issue in the opening brief, raising it for the first time in a reply brief or at oral argument, we generally decline to address the issue or address it in a summary manner. (See *People v. Duff* (2014) 58 Cal.4th 527, 550, fn. 9 [claim of ineffective assistance of counsel raised by defendant for the first time in reply brief is forfeited]; *People v. Harris* (2008) 43 Cal.4th 1269, 1290 [defendant's claim of ineffective assistance of counsel for failure to object to prosecutor's argument, made for the first time in his reply brief in response to the Attorney General's waiver argument, "is as meritless as it is belated"]; *People v. Alvarez* (1996) 14 Cal.4th 155, 241, fn. 38 [" 'perfunctorily' " rejecting defendant's claim of ineffective assistance of counsel, made for the first time in his reply brief and in a single paragraph]; *People v. Crow* (1993) 6 Cal.4th 952, 960, fn. 7 [declining to

address issue raised by defendant for the first time at oral argument]; *Varjabedian v. City of Madera* (1977) 20 Cal.3d 285, 295, fn. 11 [for reasons of fairness, court would not consider issue raised by defendant for the first time in its reply brief]; see also *People v. Barragan* (2004) 32 Cal.4th 236, 254, fn. 5 [declining to address an argument that the People, as petitioners in this court, raised for the first time in their reply brief].)  To allow an appellant to raise a new issue in its reply brief or at oral argument, "would be unfair to the respondent, and would increase the labors of the court."  (*Webber v. Clarke* (1887) 74 Cal. 11, 13.)

A respondent's failure to address an argument raised by an appellant may, under some circumstances, be interpreted as a concession.  (See *People v. Bouzas* (1991) 53 Cal.3d 467, 480, [stating that the People "apparently concede" a point made by the defendant to which they did not respond, either in briefing or in oral argument].)  We do not, however, invariably interpret the failure to respond to an argument as a concession or a forfeiture.  In *People v. Hill* (1992) 3 Cal.4th 959, "[w]e decline[d] to find a [forfeiture] based on nothing more than respondent's failure to respond to defendant's . . . argument, which was itself raised for the first time on appeal.  Such a rule would require a party to respond to his opponent's every argument, subargument, and allegation, no matter how meritless or briefly made."  (*Id.* at p. 995, fn. 3; see *Canaan v. Abdelnour* (1985) 40 Cal.3d 703, 722, fn. 17 [court exercised discretion to address point that respondent raised for the first time at oral argument, because "the point is but one aspect of the larger constitutional question"], overruled on other grounds in *Edelstein v. City and County of San Francisco* (2002) 29 Cal.4th 164, 168.)

Regardless, we have long recognized that, provided the parties have had a fair opportunity to address the issues, "[t]his court . . . is undoubtedly at liberty to decide a case upon any points that its proper disposition may seem to require, whether taken by counsel or not . . . ."  (*Hibernia Sav. and Loan Soc. v. Farnham*

32

(1908) 153 Cal. 578, 584.)  A reviewing court's authority to decide issues not initially raised or briefed by the parties is recognized in Government Code section 68081, which requires that, before doing so, "the court shall afford the parties an opportunity to present their views on the matter through supplemental briefing." (Gov. Code, § 68081.)  "An appellate court is generally not prohibited from reaching a question that has not been preserved for review by a party." (*People v. Williams* (1998) 17 Cal.4th 148, 161, fn. 6.)  In most instances, "[w]hether or not it should do so is entrusted to its discretion." (*Ibid*.)

In this instance, however, we do not have discretion to decline to address whether any error was harmless based on the Attorney General's failure to brief the issue in a timely manner.  We are prohibited by the state Constitution from reversing a judgment unless, "after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice." (Cal. Const., art. VI, § 13.)  The Attorney General's failure does not relieve this court of its constitutional responsibility to determine whether any error resulted in a miscarriage of justice.

Defendant agrees that, regarding state law error, the state Constitution requires us to conduct harmless error analysis, and argues in this respect only that he should be given adequate notice of the Attorney General's position and an opportunity to respond to it.  Ample notice and opportunity to respond were provided in the present case, through both supplemental briefing and oral argument.

Regarding errors of federal constitutional dimension, however, defendant argues that because the beneficiary of federal constitutional error has the burden of showing that the error was harmless beyond a reasonable doubt (*Chapman v. California, supra*, 386 U.S. at p. 24), we should adopt the approach that federal courts use when the government fails to argue that an error is harmless:  the issue

33

is generally considered forfeited, but the court may exercise its discretion to overlook the forfeiture, considering (1) the length and complexity of the record, (2) whether harmlessness is certain or debatable, and (3) the futility and costliness of further proceedings in the trial court.  (*United States v. Giovanetti* (1991) 928 F.2d 225, 226-227.)

Although we must apply the federal standard of harmless error in determining whether such a miscarriage has occurred (*Chapman v. California, supra,* 386 U.S. at p. 21), the forfeiture rules employed in the federal courts are not binding on this court.  None of the federal cases cited by defendant suggest that the forfeiture rules they apply are mandated by the federal Constitution.  (See *United States v. Gonzalez-Flores* (9th Cir. 2005) 418 F.3d 1093, 1100 [government's failure to argue nonconstitutional error was harmless usually waives the issue, unless harmlessness is clear beyond any serious debate]; *United States v. Davis* (3d Cir. 2013) 726 F.3d 434, 445, fn. 8 [applying same rule]; *United States v. Cacho-Bonilla* (1st Cir. 2005) 404 F.3d 84, 90 [noting that because the government made no harmless error argument, defendants had no chance to respond to any harmless error claim]; *Hargrave v. McKee* (6th Cir. 2007) 248 Fed.Appx. 718, 729 [concluding that even if the state did not forfeit the harmless error argument by failing to raise it until oral argument, the court would find the constitutional error not harmless]; *United States v. Montgomery* (8th Cir. 1996) 100 F.3d 1404, 1407 [stating the government's failure to raise harmless error in its brief waived the argument on appeal but, exercising its discretion to overlook the waiver and review the record on its own motion, court concluded the error was not harmless]; *United States v. Varela-Rivera* (9th Cir. 2002) 279 F.3d 1174, 1180 [stating the government did not argue that the error was harmless and this failure waived the argument]; *United States v. Vallejo* (9th Cir. 2001) 237 F.3d 1008, 1026 [same, adding that nevertheless, under the circumstances of the

case the error was not harmless].)  Furthermore, most of these courts explicitly recognize that they retain discretion to review the record and decide whether any error was harmless even when the government fails to make the argument.  This recognition undermines any contention that the forfeiture rule applied by federal courts is constitutionally mandated.

The state cases cited by defendant in support of his position are similarly based on those states' own procedural rules and policies, not on federal constitutional principles.  (See *State v. Almaraz* (Idaho 2013) 301 P.3d 242, 256-257 [relying on state case law holding that issues raised for the first time on appeal at oral argument are not properly before the court]; *Polk v. State* (Nev. 2010) 233 P.3d 357, 359-361 [citing state rule of appellate procedure providing that if a respondent fails to adequately respond to an appeal, the court may consider the failure to respond as a confession of error].)  These cases do not specifically discuss a failure to address harmless error.  In any event, they are not persuasive because, as noted above, under the California Constitution, this court may not reverse a judgment unless it is convinced that a miscarriage of justice has occurred, and we clearly have the authority to address matters not initially raised by the parties.  (Cal. Const., art. VI, § 13; Gov. Code, § 68081.)

Justice Liu's concurring and dissenting opinion argues that we should adopt the forfeiture rule used by the federal appellate courts, regardless of whether the error is one of state law only or is of federal constitutional dimension.  Even if such a rule could be reconciled with our constitutional obligation to address harmless error "after an examination of the entire cause, including the evidence" (Cal. Const., art. VI, § 13), we are not persuaded that we should adopt it.  If the harmless error issue is a debatable one or the record is complex, we may exercise our discretion to seek supplemental briefing and decide the issue with the benefit of full briefing from the parties.  This approach is fair to the parties and gives the

35

court the benefit of the parties' perspectives on an issue that we are obliged to address. The federal approach might avoid delay and save some effort on a reviewing court's part, but at the potential cost of an incorrect decision, resulting in unnecessary relitigation.

Defendant suggests that if we do not attach some negative consequence to the Attorney General's failure to brief harmless error, we are unfairly treating the state, as a party, more leniently than we treat criminal defendants. We disagree. We have occasionally exercised our discretion to permit defendants to file supplemental briefs raising new issues in capital appeals. (See, e.g., *People v. Howard* (2010) 51 Cal.4th 15, 26, 30, fn. 6, 33 [addressing on the merits three different contentions raised for the first time in a supplemental brief]; *People v. Carrington* (2009) 47 Cal.4th 145, 187, and docket entries, case No. S043628 [reversing two burglary convictions based on an argument made in defendant's supplemental brief, which was filed after her reply brief].) Furthermore, because our Constitution prohibits *reversal* of a judgment absent a finding that a miscarriage of justice has occurred, a respondent and an appellant are not similarly situated. Our obligation to address harmless error despite a respondent's default is a result of the constitutional mandate and is not based on the party's status as criminal defendant or the state.

5. *Harmless error analysis*

Turning to the merits of the harmless error argument, we conclude that the exclusion of Morris's statements to Lawson and to Misty Abbott that defendant did not participate in the killing does not require reversal of the special circumstance finding and the death sentence. The most reasonable interpretation of the proffered evidence that defendant did not participate in the killing, and that he was in another part of the house and did not participate in the *actual* killing, was that he did not participate in the *act* of killing. The prosecutor, however,

36

never argued that defendant participated in the act of killing. In order to find the special circumstance to be true, the jury needed to find that defendant acted either with reckless disregard for life or with the intent to kill. The prosecutor reminded the jury, "There's no requirement that he be the actual killer," and she did not suggest that he was. As the prosecutor argued, "The fact the defendant may not have killed Betty Bone himself is not of any significance in this case."

Indeed, the prosecution presented no evidence that defendant had actually participated in the homicidal act. Defendant's statement to the police indicated that he was present in the house while Morris killed Bone but that he did not participate in the killing. Misty Abbott's testimony concerning Morris's description of how he killed the victim did not include the involvement of any other person. Likewise, defendant's out-of-court statement to jailhouse informant Howe was that he never personally touched the victim and his DNA would not be found on the body. No DNA or other evidence linked defendant to the actual killing. Although Morris's grandfather testified that Morris had told him that others were wrongly blaming him for the murder, that statement was admitted only for purposes of impeachment and, in any event, nothing in it suggested that defendant assisted Morris in killing Bone.

The prosecution did present testimony from jailhouse informant Howe that defendant admitted he had ordered Morris and Wilson to kill the victim, and argued that Howe's testimony supported a true finding on the special circumstance allegation on the theory that defendant acted with the intent to kill. Defendant argues that the excluded evidence would have caused the jury to doubt Howe's otherwise uncontradicted testimony that defendant ordered the killing. We find no reasonable possibility that the excluded evidence would have caused the jury to doubt Howe's testimony. Statements that defendant did not participate in the actual killing were not inconsistent with Howe's testimony that defendant

37

admitted he ordered Morris to kill Bone, and they were consistent with Howe's testimony that defendant said he had never touched Bone.

Likewise, at the penalty phase, the prosecution did not suggest that defendant participated in the actual killing; it instead suggested only that he ordered Morris and Wilson to do it and stood by while it was done. As observed above, there is no reasonable possibility that the jury would have interpreted Morris's statements as inconsistent with Howe's testimony that defendant admitted he ordered the killing.

Defendant argues that Morris's statement to Lawson that defendant was "in another part of the house" during the killing would have contradicted Howe's prior statement to Detective O'Connor that defendant told him he watched the killing and enjoyed watching it, thereby negating these potential aggravating circumstances of the crime as well as tending to impeach Howe's testimony generally. We find no reasonable possibility that the admission of Morris's statements would have changed the jury's view of Howe's testimony, for several reasons. First, defendant in his own statement to the police admitted that he had observed at least some of Morris's actions. He conceded that he saw Morris strangling the victim and he specifically described Morris's action in stabbing the victim as well as the sounds of the stabbing. Second, there is no real conflict between Howe's statement to the detective that defendant told him he watched the murder and Morris's statement that defendant was in another part of the house during the killing. Morris's killing of Bone was a protracted effort. As defendant himself described it, he was moving about the house looking for items to steal; he was in another part of the house some of the time but he also returned to Morris's location, or at least close enough to observe his actions, at other times. Third, Howe himself, in his testimony, disavowed his statement to the detective that defendant told him he had watched the killing. Howe testified that he did not

38

know where defendant was during the killing; he may have assumed defendant watched the killing but could not be certain that defendant admitted to doing so. He was uncertain whether defendant told him he enjoyed watching the killing or that he enjoyed the fact that the victim died. Under these circumstances, it is highly improbable that the jury would have viewed Morris's statement that defendant was in another part of the house during the killing as grounds for disbelieving any part of Howe's testimony. We find no reasonable possibility that the exclusion of Morris's statements that defendant did not participate in the killing and was in another part of the house made a difference in the outcome at either the guilt or penalty phase.

### E. Instructions on circumstantial evidence

The trial court read to the jury a standard instruction regarding circumstantial evidence, CALJIC No. 8.83, which informed the jury that (1) each fact that is essential to complete a set of circumstances necessary to establish the truth of a special circumstance must be proved beyond a reasonable doubt, and (2) if there are two reasonable interpretations of the circumstantial evidence, the jury must accept the one that favors defendant. Defendant argues that instructing the jury regarding these principles only in connection with circumstantial evidence could cause the jury to believe that the principles did not apply when direct evidence is used. (See *People v. Vann* (1974) 12 Cal.3d 220, 226-227 [instruction on circumstantial evidence, in the absence of a general instruction requiring proof of guilt beyond a reasonable doubt, might have been interpreted by jurors as requiring a lesser degree of proof if the evidence is direct].) He contends the instruction undermined the requirement of proof beyond a reasonable doubt as applied to direct evidence. He further argues that this instructional error requires reversal of the special circumstance finding because it could have affected the

39

jury's consideration of Howe's testimony, which was direct evidence that defendant intended to kill.

The Attorney General contends that defendant forfeited this claim by failing to request that the trial court modify the standard instruction. We agree. "A party may not complain on appeal that an instruction correct in law and responsive to the evidence was too general or incomplete unless the party has requested appropriate clarifying or amplifying language." (*People v. Lang* (1989) 49 Cal.3d 991, 1024; see *People v. Livingston* (2012) 53 Cal.4th 1145, 1165 [defendant forfeited claim that instruction discussing proof by direct evidence should have included additional principles related to the burden of proof beyond a reasonable doubt that were contained in the instruction on circumstantial evidence]; *People v. Bolin* (1998) 18 Cal.4th 297, 328 [defendant forfeited claim that instruction directing jury to find special circumstance not true if it had a reasonable doubt as to its truth was incomplete because it did not define reasonable doubt or direct the jury to find the special circumstance "beyond a reasonable doubt"].) The instructions regarding circumstantial evidence were not incorrect or inapplicable and defendant did not request any modification of the instructions to address the concerns he now presents.

Were we to address the merits, we would have to reject the claim. An instruction "[d]ifferentiating between direct and circumstantial evidence does not undermine the reasonable doubt standard or presumption of innocence." (*People v. Livingston*, *supra*, 53 Cal.4th at p. 1166.) We addressed and rejected claims nearly identical to defendant's in *People v. Livingston* and in *People v. Soloman* (2010) 49 Cal.4th 792, 825- 827. In *People v. Soloman*, the defendant argued that because the instruction on circumstantial evidence did not refer to direct evidence, "jurors would have believed that a fact essential to guilt that was based on direct, rather than circumstantial, evidence need not be proved beyond a reasonable

40

doubt." (*Id*. at p. 826.) We noted that the trial court had instructed the jury that both direct and circumstantial evidence were acceptable means of proof, that the defendant was to be presumed innocent, and that " 'in case of a reasonable doubt whether his guilt is satisfactorily shown, he is entitled to a verdict of not guilty.' " (*Ibid*., quoting CALJIC No. 2.90.) "These instructions, coupled with the directive to 'consider the instructions as a whole and each in light of the others,' fully apprised the jury that the reasonable doubt standard applied to both forms of proof." (*People v. Soloman, supra,* at p. 826.)

As in *People v. Soloman,* the trial court in the present case fully instructed the jury on the presumption of innocence, the requirement of proof beyond a reasonable doubt, and to consider the instructions as a whole. We see no reasonable likelihood that because the jury was given some additional, more detailed, direction about how to apply the reasonable doubt standard to circumstantial evidence, but was not given such direction regarding direct evidence, the jury would have concluded that the reasonable doubt standard did not fully apply to proof by direct evidence.

Furthermore, the jury received additional relevant instructions applicable to the direct evidence with which defendant is here concerned — Howe's testimony that defendant told him he ordered the killing, which was evidence of defendant's intent. The jury was instructed that "if the evidence as to any specific intent or mental state is susceptible of two reasonable interpretations, one of which points to the existence of the specific intent or mental state and the other to the absence of the specific intent or mental state, you must adopt that interpretation which points to the absence of the specific intent or mental state."

41

## F. Failure to instruct that the jury must unanimously agree on any overt acts required for conspiracy to commit robbery

Defendant was convicted of conspiracy to commit robbery. Conspiracy to commit a crime requires proof of an overt act committed in pursuance of the conspiracy. (§ 184.) The information alleged five different overt acts in furtherance of the conspiracy. Defendant contends the trial court erred in failing to instruct the jury that it could not convict defendant of conspiracy unless the jurors unanimously agreed regarding the required overt act. Defendant concedes that this court has previously rejected the argument that jury unanimity regarding the overt act is required under state law. (*People v. Russo* (2001) 25 Cal.4th 1124, 1135 (*Russo*).) He contends, however, that *Russo* did not consider whether the federal Constitution requires the agreement of at least a majority of jurors on the overt act. Defendant cites cases holding that the Fifth, Sixth, and Fourteenth Amendments of the federal Constitution require a jury trial and proof beyond a reasonable doubt on all elements of the offense (*Sandstrom v. Montana* (1979) 442 U.S. 510, 512-514; *Mullaney v. Wilbur* (1975) 421 U.S. 684, 697-698; *In re Winship* (1970) 397 U.S. 358, 363-364; *Morissette v. United States* (1952) 342 U.S. 246, 274-275) and the agreement of some minimum number of jurors (*Burch v. Louisiana* (1979) 441 U.S. 130 [conviction by a nonunanimous six-person jury violated defendant's right to a jury trial]; *Johnson v. Louisiana* (1972) 406 U.S. 356 [agreement of nine out of 12 jurors is sufficient]).

None of the cases cited by defendant calls into question our prior conclusion that the jurors need not agree unanimously on which "overt act" of a conspiracy was proved. *Russo* reasoned that the jury must agree on what crime was committed, not how that crime was committed. "Although the jury had to find at least one overt act, whether it was one or another of several possible acts only concerns the way in which the crime was committed, i.e., the theory of the

42

case, not whether discrete crimes were committed. Thus, if the jurors disagreed as to what overt act was committed, and agreed only that *an* overt act was committed, they would still have unanimously found defendant guilty of a particular conspiracy." (*Russo*, *supra,* 25 Cal.4th at p. 1135.) Consistently with our reasoning in *Russo*, the United States Supreme Court has recognized that when the defendant's alleged conduct constitutes a single offense that may be committed in different ways, the federal Constitution does not require unanimity regarding how the crime was committed. (*Schad v. Arizona* (1991) 501 U.S. 624, 629-645 [due process clause does not require a jury to agree unanimously whether a charge of first degree murder was committed by an intentional, premeditated killing or by felony murder]; *id*. at p. 649 (conc. opn. of Scalia, J.) ["it has long been the general rule that when a single crime can be committed in various ways, jurors need not agree upon the mode of commission"]; see also *United States v. Kozeny* (2d Cir. 2011) 667 F.3d 122, 132 [jury need not agree on a single overt act to sustain a conspiracy conviction]; *United States v. Griggs* (7th Cir. 2009) 569 F.3d 341, 343 [same]; *United States v. Sutherland* (5th Cir. 1981) 656 F.2d 1181 [same].)

### G. Discovery order

Defendant contends that discovery ordered against the defense under section 1054.5 is unconstitutional and violates the federal and state privileges against self-incrimination and rights to effective assistance of counsel. Defendant recognizes that we rejected the same arguments in *Izazaga v. Superior Court* (1991) 54 Cal.3d 356, but, in order to preserve the issue for federal review, contends that case was wrongly decided and should be reconsidered. We decline to do so.

**H. Refusal of request to instruct that the jury must unanimously agree on the theory supporting the special circumstance verdict**

The robbery and burglary special circumstance allegations required that defendant either intended to kill or was a major participant in the felony and exhibited a reckless disregard for life. (§ 190.2, subds. (c) & (d).) The trial court refused to instruct the jury that it must agree unanimously on the theory that supported the special circumstance allegation. Defendant acknowledges that when a charge is prosecuted under different legal theories, the jury need not agree unanimously on which legal theory applies. (See, e.g., *People v. Jenkins, supra,* 22 Cal.4th at p. 1024 [jury need not agree whether defendant is guilty of murder based on a theory of direct culpability or a theory of accomplice liability]; *People v. Edwards* (1991) 54 Cal.3d 787, 824 [jury need not agree unanimously which acts constitute lying in wait]; *People v. Failla* (1966) 64 Cal.2d 560, 567 [in burglary case, jurors need not agree unanimously regarding which felony the defendant intended at the time of entry].) Defendant contends this is a case in which he was prosecuted under a single legal theory, with alternative factual theories that (1) defendant ordered Morris to kill the victim, in which case he acted with intent to kill, or (2) he did not order the killing but was a major participant in the robbery and his conduct evidenced a conscious disregard for life. Under these circumstances, defendant contends, the jury must agree unanimously on the acts constituting the offense. He contends that the omission of the unanimity instruction violated his Sixth Amendment right to a jury trial and his Eighth Amendment right to heightened reliability in a capital case.

A unanimity instruction is required if there is evidence that more than one crime occurred, either of which could provide the basis for conviction under a single count. (See *People v. Diedrich* (1982) 31 Cal.3d 263, 281 [when evidence suggested more than one act of bribery, jury must agree unanimously which act

44

was the basis for conviction]; see *People v. Beardslee* (1991) 53 Cal.3d 68, 92 ["A requirement of jury unanimity typically applies to acts that could have been charged as separate offenses"].) On the other hand, the unanimity instruction is not required " 'where multiple theories *or acts* may form the basis of a guilty verdict on one discrete criminal event.' " (*Russo, supra,* 25 Cal.4th at p. 1135, italics added.) "[W]here the evidence shows only a single discrete crime but leaves room for disagreement as to exactly how that crime was committed or what the defendant's precise role was, the jury need not unanimously agree on the basis or, as the cases often put it, the 'theory' whereby the defendant is guilty." (*Id.* at p. 1132.) This is true even if the two theories are based on different facts. (*People v. Jenkins, supra,* 22 Cal.4th at p. 1025 [unanimity instruction not required even where "different facts would support aiding and abetting liability and liability as a direct perpetrator"].)

In the present case, there was no evidence that more than one crime of murder was committed. Rather, the evidence left "room for disagreement as to exactly how that crime was committed or what the defendant's precise role was." (*Russo, supra,* 25 Cal.4th at p. 1132.) When the defendant's alleged conduct constitutes a single offense that may be committed in different ways, the federal Constitution does not require unanimity on how the crime was committed. (*Schad v. Arizona, supra,* 501 U.S. 624 [due process clause of U.S. Const. does not require jury to agree unanimously whether charge of first degree murder was committed by an intentional, premeditated killing or by felony murder].)

Defendant analogizes this case to *People v. Dellinger* (1985) 163 Cal.App.3d 284, 300-302, in which the Court of Appeal held that the defendant was entitled to a unanimity instruction because evidence suggested that the defendant could have killed the victim either by blunt force trauma or by cocaine poisoning. *Dellinger* recognized that in most of the cases that have addressed the

45

need for a unanimity instruction, there were not only multiple criminal acts that could have constituted the charged offense but also potentially multiple offenses. (*Id*. at p. 301.) In contrast, in *Dellinger,* "there was only one offense and one victim but there were several hypotheses as to which act or acts caused [the victim's] death." Nevertheless, the appellate court concluded that a unanimity instruction was required. "As long as there are multiple acts presented to the jury which could constitute the charged offense, a defendant is entitled to an instruction on unanimity." (*Ibid*.)

Even assuming that *Dellinger* was correctly decided, it is factually distinguishable from the present case. Here, there was no dispute as to what acts caused the victim's death. We have previously concluded the holding of *Dellinger* does not extend to the situation in which the defendant could have been convicted as an aider and abettor to a murder or as the actual killer based on a single course of conduct. (*People v. Beardslee, supra,* 53 Cal.3d at p. 93.) Much less should it apply in the present case, in which there was no dispute that defendant was guilty of murder even though he was not the actual killer, and the only issue was whether he acted with the intent to kill or as a major participant in the felony with a reckless disregard for life. No unanimity instruction was required.

### I. Misreading of the instruction on the mental state element of the felony-murder special circumstance

To prove the felony-murder special circumstance, the prosecution was required to prove either that defendant aided the murder with the intent to kill, or acted as a major participant in the felony and exhibited a reckless indifference to human life. (§ 190.2, subds. (c) & (d).) The written instructions, which were provided to the jury, correctly explained that "[a] defendant acts with reckless indifference to life *when* that defendant knows or is aware that his acts involve a grave risk of death to an innocent human being." (Italics added.) However, when

46

reading the instruction, the trial court told the jury that "[a] defendant acts with reckless indifference to life *whether* [he] knows or is aware that his acts involve a grave risk of death to an innocent human being." (Italics added.) Defendant contends this instruction was erroneous, because the trial court apparently substituted the word "whether" for "when," thereby indicating that reckless indifference could exist *whether or not* defendant knew or was aware that his acts caused a grave risk of death. He contends this instruction misstated the law and violated his rights under the Fifth and Sixth Amendments of the federal Constitution.

"The risk of a discrepancy between the orally delivered and the written instructions exists in every trial, and verdicts are not undermined by the mere fact the trial court misspoke." (*People v. Mills* (2010) 48 Cal.4th 158, 200.) "[W]e often have held that when erroneous oral instructions are supplemented by correct written ones, we assume the jury followed the written instructions, particularly when, as here, the jury is instructed that the written version is controlling." (*People v. Mungia* (2008) 44 Cal.4th 1101, 1132; see *People v. Osband* (1996) 13 Cal.4th 622, 687 [noting that the jury was instructed to be " 'governed only by [each] instruction in its final wording, whether printed, typed or handwritten' "].) Here, the jury was instructed just before the beginning of deliberations that it would be provided with the instruction in written form and that "the instructions may be typed, printed or handwritten. Portions may have been added or deleted. . . . Every part of the text of an instruction, whether typed, printed, or handwritten is of equal importance. You are to be governed only by the instruction in its final wording."

Even if we do not assume that the jury understood that the written instructions were controlling, there is no reasonable likelihood that the jury misunderstood the requirements for proof of the felony-murder special

47

circumstance. "When an appellate court addresses a claim of jury misinstruction, it must assess the instructions as a whole, viewing the challenged instruction in context with other instructions, in order to determine if there was a reasonable likelihood the jury applied the challenged instruction in an impermissible manner." (*People v. Wilson* (2008) 44 Cal.4th 758, 803.) Here, the instruction as read to the jury was, at most, ambiguous. Both the prosecution and the defense focused on the "reckless indifference" element of the special circumstance in their arguments, and correctly stated that it required that defendant knew his act created a grave risk of death. The prosecutor stated, "The definition of a reckless indifference to human life as taken from the jury instruction itself is that the defendant knows or is aware that his acts involve a grave risk of death to an innocent human being." "Mr. Grimes knew there was a grave risk by going into this house with these people that Betty Bone was gonna be killed . . . . So when we talk about reckless indifference, knowing or being aware that your acts involve a grave risk . . . it's his knowledge and his awareness at the time that he goes into this residence as to what could potentially happen to this woman." Defense counsel correctly read the instruction to the jury: "I know I have read it, but I'll read it to you again. . . . A defendant acts with reckless indifference to human life when that defendant knows or is aware that his acts involve a grave risk of death to an innocent human being." "The law on the special circumstance above and beyond the first degree murder, is that Mr. Grimes must know or be aware that his acts, his conduct, what he does, involves a grave risk of death to an innocent human being." "That's how reckless indifference is defined, when that defendant knows or is aware that his acts involve a grave risk of death to an innocent human being." In light of counsel's repeated statements and the correct written instructions, there is no reasonable likelihood that the jury was misled by the trial court's misstatement.

## J. Instructions on the robbery element of the felony-murder special circumstance

The jury was instructed that the felony-murder special circumstance could not be found true unless, among other things, the prosecution proved "the murder was committed in order to carry out or advance the commission of the crime of robbery or to facilitate the escape therefrom or to avoid detection." The jury was correctly instructed on the elements of robbery. Defendant nevertheless contends the robbery special-circumstance finding must be reversed because the trial court erred in instructing the jury with CALJIC No. 2.15, which told the jurors that if they found defendant had been in possession of stolen property, that was not enough to support a conviction of robbery and that corroborating evidence tending to prove defendant's guilt also is required, but "this corroborating evidence need only be slight, and need not by itself be sufficient to warrant an inference of guilt." Defendant contends that CALJIC No. 2.15 provided the jury an option of convicting defendant of robbery based on his possession of stolen goods plus some corroborating evidence, without finding all the elements of robbery. He also contends that it unconstitutionally lightened the state's burden of persuasion by permitting a conviction based on "slight evidence."

We have previously rejected the same arguments, concluding that CALJIC No. 2.15 appropriately permits — but does not require — jurors to infer guilt of burglary, robbery, or theft from the possession of stolen property plus some corroborating evidence, and that it does not violate due process or reduce the burden of proof. (See *People v. Gamache* (2010) 48 Cal.4th 347, 375; *People v. Parson* (2008) 44 Cal.4th 332, 355-356; *People v. Smithey* (1999) 20 Cal.4th 936, 975-977.)

Defendant relies upon federal conspiracy cases that have found a violation of due process because the jury was instructed, over the defendant's objection, that

49

" '[o]nce the existence of the agreement or common scheme of conspiracy is shown, . . . slight evidence is all that is required to connect a particular defendant to the conspiracy.' " (*United States v. Partin* (5th Cir. 1977) 552 F.2d 621, 628; see *United States v. Durrive* (7th Cir. 1990) 902 F.2d 1221, 1228 [concluding that on appellate review, reviewing court must find "substantial evidence," rather than "slight evidence," connecting defendant to the conspiracy]; *United States v. Dunn* (9th Cir. 1977) 564 F.2d 348, 356-357 [clarifying that defendant's connection to the conspiracy need only be slight, but the connection must be proved beyond a reasonable doubt].) According to these cases, the "slight evidence" instruction " 'reduced the level of proof necessary for the government to carry its burden by possibly confusing the jury about the proper standard or even convincing jury members that a defendant's participation in the conspiracy need not be proved beyond a reasonable doubt.' " (*United States v. Partin, supra*, at p. 629, quoting *United States v. Hall* (5th Cir. 1976) 525 F.2d 1254, 1256.)

The problem with the instruction addressed in these federal cases is that it permitted the jury to conclude that defendant was a participant in the conspiracy based only on "slight evidence." By contrast, the CALJIC No. 2.15 permits conviction of theft-related offenses based upon evidence that the defendant was recently found in possession of stolen property *plus* additional, "slight," corroborating evidence. We have recognized that "[p]ossession of recently stolen property is so incriminating that to warrant conviction there need only be, in addition to possession, slight corroboration in the form of statements or conduct of the defendant tending to show his guilt." (*People v. McFarland* (1962) 58 Cal.2d 748, 754.) Defendant's reliance on the federal conspiracy cases is, therefore, inapt.

50

### K.  Admission of testimony from a jailhouse informant

Jonathan Howe, an inmate in the county jail where defendant was incarcerated before trial, testified at trial regarding admissions that defendant made to him.  Before trial, defense counsel unsuccessfully moved to exclude Howe's testimony on several grounds, but he did not contend that the testimony should be excluded on the ground that Howe's plea agreement with the prosecution placed him under a strong compulsion to testify in accordance with his pretrial statements.  Defendant contends his counsel rendered constitutionally deficient assistance in failing to move to exclude or strike Howe's testimony on this latter ground.

It is proper for the prosecution to present the testimony of a witness pursuant to a plea bargain if the witness believes that the agreement merely requires him to testify truthfully.  (*People v. Garrison* (1989) 47 Cal.3d 746, 768; *People v. Johnson* (1989) 47 Cal.3d 1194, 1229.)  A defendant is denied a fair trial, however, if a plea agreement places the witness under "a strong compulsion to testify in a particular fashion."  (*Garrison*, *supra*, at p. 768.)  Here, there is no evidence that Howe was under any compulsion to testify in accordance with his previous statements.  Howe pleaded guilty to certain pending charges and agreed to a sentence of up to 24 months in exchange for the dismissal of other charges.  He had been offered this same agreement before he came forward with information regarding defendant, except that the sentence would have been an agreed-upon term of 24 months.  The actual length of his sentence would be decided by the same judge who was presiding in the present case, depending upon his determination as to whether Howe testified truthfully.  The written plea agreement stated that Howe had "an obligation to do nothing other than to tell the truth, fully and accurately."

51

Defendant argues that because the prosecution put Howe through a voice stress test and two polygraphs before his testimony, it was clear to Howe that the prosecution believed his pretrial statements were truthful and he therefore would have understood the agreement to testify truthfully to mean he was required to testify in accordance with his pretrial statements. The record demonstrates that any such notion was dispelled by the trial court's very clear direction that Howe was to tell the truth in court regardless of what he may have said previously. At his plea hearing, Howe told the judge that it was his understanding that he would have to testify truthfully and "consistent with any report I've — I've made so far in this case." The judge clearly explained to him that he was to "testify truthfully whether or not it's consistent with any other statement. . . . [I]f telling the truth here, the actual truth, would be inconsistent with something you've previously said, that fact that it's inconsistent will not cause me to conclude that you're not being truthful. . . . In other words, I don't want you to think in any way, Mr. Howe, that for me to believe you're telling the truth that what you say here in this courtroom has to be consistent with something you've said before. . . . In other words, do not say something that isn't true because it's consistent with what you said previously to law enforcement, in hopes that I will therefore conclude you're telling the truth here." Howe repeatedly affirmed that he understood. Given these facts, any challenge to Howe's testimony on the grounds that he was under pressure to testify consistently with his former statements would have been unsuccessful. There being nothing in the record to demonstrate defense counsel performed deficiently by failing to challenge Howe's testimony on these grounds, relief on direct appeal is unwarranted. (See *People v. Mendoza Tello* (1997) 15 Cal.4th 264, 266-267; *People v. Pope* (1979) 23 Cal.3d 412, 426.)

52

**L. Alleged deficient performance by counsel in advising defendant to reject plea bargain**

Defendant contends that his trial counsel performed deficiently in advising him to reject a plea bargain that would have avoided the death penalty before counsel was sufficiently familiar with the case to render such advice. Because the record does not establish what counsel knew about the case at the time the plea bargain was refused or what advice counsel gave to defendant, defendant has not shown that his counsel's actions fell below an objective standard of reasonableness.

Defendant was charged with murder and special circumstances in October of 1995 and pled not guilty. Fifteen months later, in January of 1997, the District Attorney of Shasta County, Dennis Sheehy, notified defendant's counsel that he had decided not to seek the death penalty. Because defendant was not the actual killer, District Attorney Sheehy did not believe that a jury would impose the death penalty. Shortly thereafter, Mr. Sheehy resigned as the district attorney and McGregor Scott replaced him. On May 23, 1997, in response to defendant's *Marsden* motion (*People v. Marsden* (1970) 2 Cal.3d 118), the court appointed new counsel, Richard Maxion, for defendant. Two weeks after Maxion was appointed, on June 6, District Attorney Scott informed the court that he would be seeking the death penalty as of June 27 unless, prior to that date, defendant decided to plead guilty to special circumstances murder. In court on June 27, defense counsel stated that his client would not be pleading guilty and the prosecutor announced that he would be seeking the death penalty.

Prior to trial, defendant moved to prohibit the prosecution from seeking the death penalty on a number of grounds, including claims that the decision to seek the death penalty constituted vindictive prosecution and that defendant was denied effective assistance of counsel because counsel Richard Maxion had not been

53

given enough time to attempt to persuade the district attorney not to seek death. At the hearing on defendant's motion the trial court rejected the claim that the prosecution's offer to allow the defendant a three-week period to decide whether to plead guilty in exchange for a life sentence denied defendant effective assistance of counsel because it was made only two weeks after new counsel was appointed. Testimony established that defense counsel had agreed to the deadline, and that the prosecutor would have given him more time if he had asked for it.

Here, defendant contends that his counsel rendered constitutionally deficient assistance in advising him not to accept the plea before he had adequately familiarized himself with the case. A defendant has the right to effective assistance of counsel in deciding whether to accept or reject a proposed plea agreement. (See *In re Alvernaz* (1992) 2 Cal.4th 924, 937.) In order to establish a claim of constitutionally deficient performance by counsel, defendant must establish that (1) counsel's representation fell below an objective standard of reasonableness under prevailing professional norms; and (2) there is a reasonable probability that, but for counsel's failings, the result would have been more favorable to defendant. (*Strickland v. Washington* (1984) 466 U.S. 668, 687-696.) "[A] defense attorney's simple misjudgment as to the strength of the prosecution's case, the chances of acquittal, or the sentence a defendant is likely to receive upon conviction, among other matters involving the exercise of counsel's judgment, will not, without more, give rise to a claim of ineffective assistance of counsel." (*In re Alvernaz, supra*, at p. 937.) "When a claim of ineffective assistance is made on direct appeal, and the record does not show the reason for counsel's challenged actions or omissions, the conviction must be affirmed unless there could be no satisfactory explanation." (*People v. Anderson* (2001) 25 Cal.4th 543, 569; see *People v. Mendoza Tello, supra*, 15 Cal.4th at pp. 266-267.).)

54

The record does not show how much counsel knew about the case, how counsel advised defendant, or what defendant's response was. There is no evidence that he did not advise defendant to accept the offer. Defendant contends that the record demonstrates that counsel could not have had a sufficient understanding of the case to adequately advise defendant at the time that defendant declined the plea offer and that, if properly advised, defendant would have accepted the plea. He bases this conclusion on the fact that during jury selection (was more than a year after defendant declined the offer), when counsel was fully prepared for trial, counsel told the court that defendant was willing to plead guilty and accept a sentence of life without the possibility of parole. But the record does not establish that defendant's decision to plead guilty was based on counsel's additional knowledge about the case. Any number of circumstances, unrelated to counsel's representation, may have occurred during the time between defendant's rejection of the plea offer and the start of trial, that could have led defendant to change his mind.[4] Consequently, defendant has failed to show that counsel's conduct fell below professional norms or that defendant would have pled guilty if properly advised.

### M. Prosecution's decision to seek death unless defendant pled guilty to murder and the special circumstance

Defendant contends he was denied due process when the district attorney decided to reverse the decision of the prior district attorney and to seek the death penalty unless defendant pleaded guilty to the charge of murder with special circumstances. As explained above, after the district attorney's office notified

---

[4] For example, during this time period witness Howe came forward to offer evidence that defendant admitted he directed Morris to kill Bone, and trial counsel became aware that Howe might be called as a witness.

defendant that it would not seek the death penalty, a new district attorney was appointed. He reconsidered that decision and decided to seek the death penalty, but gave defendant the opportunity to plead guilty to the charges of murder with special circumstances and serve a sentence of life without possibility of parole. Defendant argues his right to due process was violated because the district attorney sought the death penalty after defendant refused to plead guilty, thereby punishing him for exercising his right to a jury trial.

Under the due process clause, prosecutors may not "tak[e] certain actions against a criminal defendant, such as increasing the charges, in retaliation for the defendant's exercise of constitutional rights. [Citations.] It is not a constitutional violation, however, for a prosecutor to offer benefits, in the form of reduced charges, in exchange for a defendant's guilty pleas, or to threaten to increase the charges if the defendant does not plead guilty. [Citations.] In the pretrial setting, there is no presumption of vindictiveness when the prosecution increases the charges or, as here, the potential penalty. [Citations.] Rather, the defendant must 'prove objectively that the prosecutor's charging decision was motivated by a desire to punish him for doing something the law plainly allowed him to do.' " (*People v. Jurado* (2006) 38 Cal.4th 72, 98.)

Absent proof of vindictiveness or other improper motive, increasing the charges or punishment when a plea bargain is refused does not constitute unconstitutional punishment or retaliation for the exercise of a defendant's legal rights. "[I]n the 'give-and-take' of plea bargaining, there is no such element of punishment or retaliation so long as the accused is free to accept or reject the prosecution's offer." (*Bordenkircher v. Hayes* (1978) 434 U.S. 357, 363.) The district attorney was free to change the decision made by his predecessor not to seek the death penalty, and that decision does not raise a presumption of vindictiveness. (See *United States v. Goodwin* (1982) 457 U.S. 368, 381-385.)

"A prosecutor should remain free before trial to exercise the broad discretion entrusted to him to determine the extent of the societal interest in prosecution.  An initial decision should not freeze future conduct."  (*Id*. at p. 382.)

In the present case, the record establishes nothing more than that a plea bargain was offered and refused.  The trial court conducted a hearing at which the district attorney explained why he disagreed with the decision of his predecessor, who had considered the decision a close call but believed that a jury was not likely to return a death verdict.  The new district attorney reconsidered that decision after a thorough review of the case.  Following a hearing at which both the former and current district attorneys testified, the trial court concluded that the decision was not arbitrary or capricious and that there was no element of retaliation in the decision.  Nothing in the record supports defendant's argument to the contrary.

### N.  Trial court's refusal to instruct that the jury could return a life sentence even in the absence of any mitigating circumstances

The trial court refused to instruct the jury, as defense counsel requested, that it could impose a life sentence "even in the absence of mitigating evidence," if it concluded that "the aggravating evidence is not comparatively substantial enough to warrant death."  Instead, the court instructed the jury as follows:  "In weighing the various circumstances you determine under the relevant evidence which penalty is justified and appropriate by considering the totality of the aggravating circumstances with the totality of the mitigating circumstances.  To return a judgment of death each of you must be persuaded that the aggravating circumstances are so substantial in comparison with the mitigating circumstances that it warrants death instead of life without parole."  (See CALJIC No. 8.88.)  Defendant contends that the court's failure to instruct the jury that it could return a life sentence even in the absence of mitigating factors violated both the due process clause and the Eighth Amendment of the federal Constitution.

57

We have rejected similar claims, concluding that, under instructions like those given here, "[t]he jury may decide, even in the absence of mitigating evidence, that the aggravating evidence is not comparatively substantial enough to warrant death." (*People v. Duncan* (1991) 53 Cal.3d 955, 979.) "By stating that death *can* be imposed in only one circumstance — where aggravation substantially outweighs mitigation — the instruction clearly implies that a sentence less than death *may* be imposed in all other circumstances. 'No reasonable juror would assume he or she was required to impose death despite insubstantial aggravating circumstances, merely because no mitigating circumstances were found to exist.' " (*People v. Ray* (1996) 13 Cal.4th 313, 356.)

Even assuming that the proposed instruction would have clarified how the instructions given would apply if there were no mitigating evidence at all, such clarification was not required in the present case. Defendant did present mitigating evidence, including evidence of his mental impairments, his positive relationships with friends and family, and the circumstance of the crime that defendant was not the actual killer. Although the jurors may have given little weight to this evidence, there is no reasonable possibility that they viewed this as a case in which there was no mitigating evidence at all.

### O. Failure to instruct that accomplice Cline's statements to police should not be relied upon unless corroborated, or that they should be viewed with caution

Anna Cline, defendant's accomplice in a prior robbery to which he pleaded guilty, testified at the penalty phase regarding the circumstances of that robbery. She testified that the robbery was her idea and that she and defendant had agreed that no one would be hurt. The prosecution also introduced testimony regarding her statements to police officers about this crime. She told one officer that

58

defendant had forced her to help him with the robbery. She told another that defendant had wanted to hurt the victim, but she stopped him.

The jury was instructed that Cline was an accomplice as a matter of law, and that an accomplice's testimony incriminating the defendant should be viewed with caution. Defendant contends the instructions were insufficient in two ways. First, they did not require that Cline's testimony be corroborated. Second, they did not inform the jury that the accomplice's testimony included her out-of-court statements. (See CALJIC No. 3.11.)

### 1. Corroboration

Defendant contends the trial court erred in refusing his request to instruct the jury that the testimony of an accomplice must be corroborated. Section 1111 provides that a conviction cannot be based upon the testimony of an accomplice unless that testimony is corroborated by other evidence tending to connect the defendant with the commission of the crime. This corroboration requirement applies not only to the accomplice's testimony but also to an accomplice's out-of-court statements when they are used as substantive evidence. (*People v. Andrews* (1989) 49 Cal.3d 200, 214.) Corroboration is also required at the penalty phase when the prosecution introduces accomplice testimony as evidence of unadjudicated prior criminal conduct. (*People v. Mincey* (1992) 2 Cal.4th 408, 461; *People v. Varnum* (1967) 66 Cal.2d 808.) The jury need not be instructed, however, that an accomplice's testimony about the defendant's prior criminal conduct requires corroboration if the crime was previously adjudicated. (*People v. Moore* (2011) 51 Cal.4th 1104, 1143; see *People v. Williams* (1997) 16 Cal.4th 153, 276 [jury need not be instructed that accomplice's testimony regarding the circumstances of a crime of which defendant had previously been convicted must be viewed with caution].)

Defendant contends that corroboration was nonetheless required here because Cline's prior statements were not admitted to prove that defendant committed the prior robbery — facts that had previously been adjudicated — but to establish the extent and nature of defendant's involvement in that crime — facts that had not previously been adjudicated. The same was true, however, in *People v. Williams*, *supra*, 16 Cal.4th at pages 184, 276, in which we rejected the argument that corroboration of an accomplice's testimony was required. The corroboration requirement applies only when accomplice testimony is used to prove that defendant committed a crime. (See § 1111 ["A conviction cannot be had upon the testimony of an accomplice unless it be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense . . . ."].)

### 2. *Cautionary instruction on accomplice's out-of-court statements*

Defendant contends trial counsel rendered constitutionally deficient assistance in failing to prepare and submit to the trial court an instruction clarifying that not only must an accomplice's in-court testimony be viewed with caution, but also that the accomplice's out-of-court statements should be viewed with caution. Defendant states that the trial court agreed to instruct the jury on this concept, but that counsel inexplicably failed to prepare an appropriate instruction. The record is not so clear. The trial court refused counsel's request to give the standard instruction on corroboration, CALJIC No. 3.11, which included a statement that "testimony" includes an out-of-court statement by the accomplice. It agreed to give the instruction requiring that the testimony of an accomplice that incriminates the defendant be viewed with caution, CALJIC No. 3.18. The standard cautionary instruction, however, did not refer to an accomplice's out-of-court statement. (CALJIC No. 3.18.) Although the trial court's comments suggest

60

that it believed the accomplice's out-of-court statements should be viewed with caution, it never explicitly ruled that the jury should be so instructed or directed defense counsel to modify the cautionary instruction to include this concept. It simply directed counsel to replace the version of CALJIC No. 3.18 that had previously been submitted with the more recent version.

In any event, we may treat defendant's claim as one that his counsel rendered constitutionally deficient assistance in failing to request that the trial court give a modified version of the cautionary instruction to explain that "testimony" of an accomplice includes the accomplice's out-of-court statements. To establish such a claim, defendant must show, among other things, that "but for counsel's unprofessional errors and/or omissions, the trial would have resulted in a more favorable outcome." (*In re Visciotti* (1996) 14 Cal.4th 325, 352.)

Defendant does not convince us that there is a reasonable probability that the penalty jury would have reached a different result had it been instructed that Cline's out-of-court statements should be viewed with caution. Because of the inconsistencies between Cline's in-court testimony and her out-of-court statements, the jury would have been well aware that it needed to carefully consider the credibility of those statements. In addition, one of the officers testified that she admitted to him that her statements to law enforcement were "payback," for defendant "rolling over on her," testimony that provided the jury with further reason to be cautious in relying on those statements.

### P. Trial court's failure to rule on admissibility of aggravating evidence before voir dire

Defendant claims the trial court erred and deprived him of his rights to an impartial jury and effective assistance of counsel when it refused to rule on the admissibility of aggravating evidence prior to voir dire. The trial court did not err.

In the prosecution's notice of its aggravating evidence against defendant, the prosecution alleged five incidents of unadjudicated criminal activity involving "the use or attempted use of force or violence." Two months prior to voir dire, defense counsel requested a hearing to determine whether the prosecution had sufficient evidence to prove these incidents at the penalty phase. The trial court declined to conduct a hearing at that time and indicated that it would hear an offer of proof before the penalty phase trial and then determine whether a hearing was required. After the guilt phase verdict, the trial court ruled that three of the five incidents were admissible. Ultimately, the prosecution introduced evidence of only one of these unadjudicated matters — a 1993 incident in which defendant argued with his girlfriend, choked her, grabbed the keys to their car, and drove for 20 minutes while holding her down by the neck.

Defendant contends that because of the trial court's failure to rule on the admissibility of these incidents before voir dire, he did not question any of the jurors who sat on the case about how they would treat evidence of such violent acts. He argues that the trial court thereby deprived him of the opportunity to ensure, through voir dire and the appropriate use of peremptory challenges and challenges for cause, that jurors hearing this type of aggravating evidence could be impartial.

The trial court has discretion to decide whether a hearing should be conducted to determine whether the prosecution has sufficient evidence to prove a defendant's alleged unadjudicated criminal activity beyond a reasonable doubt. (*People v. Boyer* (2006) 38 Cal.4th 412, 477, fn. 51; *People v. Fauber* (1992) 2 Cal.4th 792, 849; *People v. Philips* (1985) 41 Cal.3d 29, 72, fn. 25.) But we have never suggested that such a hearing, if conducted, must be conducted prior to voir dire. Defendant has not cited any circumstance of the present case that established a particular need for a pretrial determination of the admissibility of the

prosecution's evidence in aggravation so as to render the trial court's failure to resolve this issue before trial an abuse of discretion.

Defendant argues that because evidence of prior violence is critical at the penalty phase, he was entitled to question prospective jurors about their response to such evidence — to ask them for example, whether they could consider mitigation in a case in which the defendant had committed prior acts of violence. He cites in support of this argument *People v. Daniels* (1991) 52 Cal.3d 815, 879, in which we held that the state must provide the defense with notice of the aggravating evidence it will rely on in seeking the death penalty prior to voir dire, so that, among other things, a defendant will have "the ability to conduct voir dire with adequate knowledge of the facts that will be presented on the issue of penalty as well as the issue of guilt." Consistent with *Daniels*, however, defendant was on notice before voir dire that the prosecution would present evidence regarding defendant's prior criminal activities, both adjudicated and unadjudicated. The prosecution's notice of aggravation included not only the five incidents of unadjudicated violent criminal activity whose admissibility defendant contends should have been resolved before voir dire, but also five prior felony convictions, including the circumstances surrounding defendant's conviction for a robbery and possession of a sawed-off shotgun. Defendant thus had every opportunity and motive to question the prospective jurors to determine whether evidence of defendant's prior violent activity might affect their ability to impartially decide the issue of penalty. Defendant does not explain how having additional information about which of the aggravating incidents of prior violence would *actually* be presented to the jury would have changed the manner in which defense counsel conducted voir dire.

### Q. Prosecutor's argument that defendant had provided the jury with no reason to doubt Howe's testimony

Defendant contends the prosecutor committed misconduct in arguing that the defense had "never given [the jury] a reason to doubt [Howe's] testimony." He argues that the prosecutor knew that such evidence existed because she had successfully objected to the defense's attempt to introduce evidence that might have cast doubt on Howe's testimony that defendant had ordered Morris to kill Bone — specifically, Morris's hearsay statements that defendant was not involved in the actual killing and that he was surprised when Morris killed the victim. (See part II.D., *ante*.) Defendant claims that the prosecutor's misconduct violated due process and requires reversal of the death judgment, citing cases holding that due process precludes a prosecutor from asking a jury to convict a defendant because the defendant has failed to introduce evidence that the court has excluded on the prosecution's own motion. (See, e.g., *Paxton v. Ward* (10th Cir. 1999) 199 F.3d 1197, 1217-1218; *United States v. Ebens* (6th Cir. 1986) 800 F.2d 1422, 1440-1444.)

Defendant, however, has forfeited this claim because defense counsel did not object to the prosecutor's argument at trial. Generally, a defendant forfeits a claim of prosecutorial misconduct in argument unless the defendant makes a specific objection to the argument in the trial court and requests that the jury be admonished to disregard it. (*People v. Jackson* (2014) 58 Cal.4th 724.) The failure to do so will be excused if an objection would have been futile or if an admonition would not have cured the harm caused by the misconduct. (*Ibid*.) Defendant claims that an admonition would not have cured the harm and that, if it would have, defense counsel rendered ineffective assistance in failing to object to it. We disagree.

There is no reason to believe that, if an objection had been sustained and the court had admonished the jury to ignore the prosecutor's remark, the jury could not have done so. We generally presume that a jury will follow an admonition to disregard questions or arguments to which the trial court has sustained an objection. (*People v. Letner and Tobin* (2010) 50 Cal.4th 99, 173.)

Counsel did not provide constitutionally deficient assistance in failing to object because there was no misconduct by the prosecutor that would have provided grounds for a successful objection. "Ineffective assistance of counsel under the Sixth Amendment entails deficient performance under an objective standard of professional reasonableness and prejudice under a similarly objective standard of a reasonable probability of a more favorable outcome in the absence of the deficient performance." (*People v. Cole* (2004) 33 Cal.4th 1158, 1202, fn. 11; see *Strickland v. Washington*, *supra*, 466 U.S. at pp. 687-696.)

A prosecutor's argument constitutes misconduct under California law if it involves "the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury." (*People v. Strickland* (1974) 11 Cal.3d 946, 955.) "A prosecutor is given wide latitude to vigorously argue his or her case and to make fair comment upon the evidence . . . ." (*People v. Ledesma* (2006) 39 Cal.4th 641, 726.) Here, the prosecutor's comment was a response to defense counsel's argument that the jury should not believe Howe's testimony because of his use of numerous aliases, his criminal history, and the inconsistency between his testimony that defendant ordered the killing and other evidence indicating that defendant was a follower, not a leader. Furthermore, her comment that the jury had no reason to doubt Howe's testimony was based on her argument that the defense had "never been able to give you a reason that Mr. Howe would lie. . . . In fact, the evidence was Mr. Howe had been friends with defendant." The excluded

65

evidence of Morris's statements would not have supplied the jury with a motive for Howe to lie.

Nor did the prosecutor's comments violate defendant's right to due process under the federal constitution. Defendant relies on the principle that due process precludes a prosecutor from asking the jury to convict or execute a defendant because he failed to present certain evidence when the defendant has not been given a full opportunity to present that evidence. (*Simmons v. South Carolina* (1994) 512 U.S. 154 [due process violated when prosecution argued defendant would pose a future danger to society if he were not executed, but court refused to inform jury that he would not be eligible for parole]; *Skipper v. South Carolina* (1986) 476 U.S. 1, 5, fn. 1 [due process violated when defendant was not permitted to introduce evidence of his good behavior in prison in response to prosecution's argument that he posed a future danger if not executed].) In the present case, defendant was not denied the opportunity to challenge Howe's credibility. The trial court merely ruled, under California laws of evidence regarding hearsay, that some of the evidence he offered — Morris's hearsay statements — was not sufficiently reliable to be considered by the jury. Defendant was permitted to cross-examine Howe and to make the jury aware not only of his numerous prior convictions but also his frequent use of aliases, as well as his potential bias because he stood a chance of benefitting personally from his testimony. Howe's sentencing on certain pending offenses to which he had pleaded guilty was postponed until after defendant's trial. At that time, the sentencing judge — who would be the same judge who was presiding over defendant's trial — could, in his discretion, sentence Howe to something less than the two-year maximum consecutive sentence to which he had agreed in a plea bargain. Under these circumstances, the prosecutor's argument was not improper

66

and did not violate defendant's due process rights. Consequently, counsel did not perform deficiently in failing to object to it.

### R. Trial court's dismissal of Juror No. 27417 for misconduct, failure to grant a mistrial, and refusal to grant a new trial based on Juror No. 24777's alleged misconduct

#### 1. Dismissal of Juror No. 27417 and refusal to grant a mistrial

Defendant contends the trial court erred in discharging Juror No. 27417 during penalty phase deliberations but alternatively, if discharging the juror was proper, he argues the trial court erred in refusing to grant a mistrial after the juror was dismissed.

Shortly after penalty phase deliberations began, Juror No. 27417 requested to speak to the judge. The juror gave the court a letter explaining that, during the guilt phase, he had reluctantly agreed that the special circumstance was true based on defendant's acting with a reckless indifference to life. After hearing the opening statements at the penalty phase, the juror realized that defendant faced a minimum term of life without parole. He was concerned about the available sentencing choices because "I do not believe the crime he committed is deserving of such a severe punishment." Upon questioning, he assured the court that he could follow the instructions, deliberate, and make a decision. He was permitted to resume deliberations.

Subsequently, the district attorney reported to the court that his office had discovered that the juror had talked to people at his workplace about his "unwillingness to impose certain penalties and that he was having trouble deliberating with members of the jury." The court conducted a hearing, at which two of the juror's coworkers testified. One testified that the juror had spoken to him about the case two or three times. The first conversation occurred at an early stage of the trial and was very general. A few weeks later, they had another

conversation. The case was nearing the conclusion of the guilt phase and there was some discussion about two options that the jury was going to address, one of which involved "reckless indifference to human life." The juror mentioned that he wanted to educate himself more about what those words meant. The coworker testified that the juror mentioned that "he was one of the last people to come around to those terms," that is, that he had not decided yet. Within the previous week, the two had another conversation. The juror told him the jury was deliberating between the death penalty and life in prison and he was undecided.

A second coworker testified that the juror had also talked to him about the case. The juror told him the case was in a second phase, and he was concerned that he did not fully understand the consequences of the first phase and how they related to the second phase. He mentioned the phrase "reckless indifference to life" and that it was a "key component." The coworker recounted that the juror was not familiar with the term and may have asked for clarification from the judge. The juror was concerned that the decision was a difficult one and he was conscientiously reviewing the case.

When questioned, the juror admitted he had had conversations with these two coworkers about the case. Whenever he talked to someone about what was going on, he tried to warn them not to make any comment that might influence him. He acknowledged that he had been instructed not to discuss the case, "[a]nd I tried to do that. To not discuss it. And I guess it depends on how — how we define what discussing the case means." The juror remembered mentioning to someone that the phrase "reckless indifference to human life" was pivotal and that he wished he understood it better. He questioned whether the court would define that conversation as "discussing it." When the trial court told him it definitely would, he replied, "Oh, you would? Okay." He remembered expressing that he felt some jurors were not giving defendant the benefit of the doubt. He also shared

with his wife his frustrations that some jurors seemed to have made up their mind and were not willing to look at the whole picture. None of the people he talked to made any substantive response that could have influenced his thinking.

Over defense counsel's objection, the court discharged the juror, concluding that he had committed serious and willful misconduct by repeatedly discussing the case with outsiders. The court also concluded that it could not rely on the juror's ability to follow the court's instructions or to reasonably interpret them, because, even if the juror had been acting in good faith, his interpretation of the admonition not to discuss the case was unreasonable. The court denied defendant's motion for a mistrial, concluding that none of the other jurors had been affected by the discharged juror's misconduct.

The trial court subsequently denied defendant's motion for a new trial of the penalty phase based on the trial court's discharge of the juror. The court rejected defendant's argument that the juror's misconduct was not serious, noting that the juror had expressed to outsiders his state of mind on issues that were before him as a juror and that he had commented on the deliberative process. The court also denied defendant's motion for a new trial of the guilt phase based on the juror's misconduct, concluding there was no substantial likelihood that the juror's conduct resulted in prejudice at the guilt phase. The court found no evidence that the juror received any information from or was influenced by any of the people he discussed the case with, and there was no evidence that he was biased against defendant.

"If at any time, whether before or after the final submission of the case to the jury, a juror dies or becomes ill, or upon other good cause shown to the court is found to be unable to perform his or her duty, . . . the court may order the juror to be discharged and draw the name of an alternate . . . ." (§ 1089.) "While a trial court has broad discretion to remove a juror for cause, it should exercise that

69

discretion with care." (*People v. Barnwell* (2007) 41 Cal.4th 1038, 1052, fn. omitted.) The trial court's decision to dismiss a sitting juror will be upheld on review if the juror's inability to serve appears in the record "as a 'demonstrable reality.' " (*People v. Wilson*, *supra*, 44 Cal.4th at p. 821.) This standard of review is more stringent than the deferential " 'substantial evidence' " test. (*Ibid*.) "Under the demonstrable reality standard . . . the reviewing court must be confident that the trial court's conclusion is manifestly supported by evidence on which the court actually relied." (*People v. Barnwell, supra*, at p. 1053.)

In *People v. Daniels, supra,* 52 Cal.3d 815, the trial court excused a juror who had read a newspaper account of the case, discussed the case with outsiders, and expressed an opinion on the issue of guilt prior to deliberations. (*Id*. at p. 863.) We held that a court may remove a juror for "serious and willful misconduct," even if that misconduct does not suggest a bias toward either side. (*Id*. at p. 864.) We concluded that the juror's misconduct in violating the court's instructions not to talk or read about the case rendered her "unable to perform his duty," which "includes the obligation to follow the instructions of the court, and a judge may reasonably conclude that a juror who has violated instructions to refrain from discussing the case . . . cannot be counted on to follow instructions in the future." (*Id*. at p. 865.)

Similarly, in *People v. Ledesma*, *supra*. 39 Cal.4th at pages 742-743, the trial court discharged a juror who "admitted that he had discussed the case with his wife in violation of the court's admonition — an act that constitutes deliberate misconduct." (*Id*. at p. 743.) The juror had recounted the story of the case to his wife in order to help himself sort it out. His wife told him that he had a difficult decision to make and gave him an opinion which, in the juror's view, " 'left me with the same decision that I had before.' " (*Id*. at p. 742.) We upheld the trial court's decision to remove the juror, citing our statement in *People v. Daniels* that

the trial court could reasonably conclude the juror would be unable to follow the court's instructions in the future. (*People v. Ledesma, supra,* at p. 743.)

In the present case, after the jurors were sworn, they were instructed "not to discuss this case with anyone . . . not even with a fellow sworn trial juror." Before the presentation of evidence, the jury was instructed, in the language of CALJIC No. 0.50, that "[y]ou must not converse among yourselves or with anyone else on any subject connected with this trial" except when deliberating. The jurors were frequently reminded of this admonition during the course of the trial. Nevertheless, the evidence was undisputed that the juror had discussed the case with outsiders during the trial. The juror was aware of the instruction not to discuss the case but apparently thought that the discussions he had with coworkers did not violate the instruction. The trial court decided that the juror's misinterpretation of the instruction not to discuss the case, even if made in good faith, was not reasonable. The trial court's conclusion that the juror's failure to understand and follow this simple instruction constituted grounds to doubt his ability to follow the court's instructions in the future was manifestly supported by the evidence upon which the trial court relied.

Defendant argues, in the alternative, that if the trial court did not err in dismissing the juror, it should have granted defendant's motions for a mistrial and for a new trial on the guilt phase based on the prejudicial effect of the juror's misconduct. The record shows that Juror No. 27417 spoke about the case during both the guilt and penalty phases. Defendant argues that if the juror was unfit to serve during the penalty phase, then he was also unfit to serve during the guilt phase. We disagree.

The removal of a juror for misconduct does not necessarily mean that a mistrial is warranted. A juror may be removed if, as here, his misconduct establishes that he is unlikely to be able to follow the court's instructions in the

71

future.  No finding of prejudice is required before the juror may be removed, and misconduct that justifies removal does not necessarily taint the rest of the jury or a previous verdict.  Juror misconduct does raise a presumption of prejudice, but that presumption "is rebutted, and the verdict will not be disturbed, if the entire record in the particular case, including the nature of the misconduct or other event, and the surrounding circumstances, indicates there is no reasonable probability of prejudice, i.e., no *substantial likelihood* that one or more jurors were actually biased . . . ."  (*In re Hamilton* (1999) 20 Cal.4th 273, 296.)  We independently determine whether such a reasonable probability of prejudice exists, but accept the trial court's findings of fact and credibility determinations if supported by substantial evidence.  (*People v. Harris, supra,* 43 Cal.4th at p. 1303; *People v. Danks* (2004) 32 Cal.4th 269, 304.)

In the present case, although the trial court concluded that there was sufficient doubt about the juror's ability to follow the court's instructions to justify his removal, it also concluded that the juror had not been influenced by any of the people he talked to about the case.  That conclusion is well supported by the evidence.  The juror's coworkers never testified that they said anything to him about the case that could possibly have influenced him.  The juror himself, who was forthcoming in his testimony, testified that when he talked to others about what was going on with the case he cautioned them not to say anything that might influence him, and none of them did so.  The record demonstrates that there is no reasonable probability that the juror was biased against defendant or that his discussion of the case with his wife or coworkers in any way affected the jury's deliberations at the guilt phase.

## 2. Alleged misconduct of Juror No. 24777

Defendant contends that the trial court erred in refusing to grant a mistrial based on the misconduct of another juror, Juror No. 24777, whose discussions of the case with outsiders, he contends, was comparable to the misconduct of Juror No. 27417.  In a motion for new trial, defendant presented affidavits from three persons who stated that Juror No. 24777 had discussed the case during trial and that she had stated the opinion that defendant would receive the death penalty.  The court conducted a hearing, at which the three witnesses and Juror No. 24777 testified.

The three witnesses had been present at the juror's place of employment, a childcare classroom at an alcohol and drug rehabilitation program.  Kathleen Hash testified that she overheard the juror talking about the case with another woman in the childcare classroom.  The juror "was talking about being on a jury, of three men and an elderly lady, and she was on the trial for the one gentleman, and that the jury had not made a decision yet on what was going to happen, but more than likely he was going — he was looking at life or death, and more likely he was going to get the death penalty."  Hash testified that she and witnesses Tina Ferreria and Susan Mayberry then starting discussing the case with the juror.  The juror told them that the case involved three men, and the one that had killed the elderly lady killed himself in jail."  She also mentioned that a "guy had driven the truck into the lake."

Ferreria similarly testified that she recalled a conversation with Juror No. 24777 in the classroom at which Hash and Mayberry were present, during which the juror said the case involved "the old lady that they stole her car and left it in the lake.  Mayberry recalled a conversation with the juror at which Ferreria was present, but she did not recall Hash being there.  Mayberry testified that the juror told them that she was on the Gary Grimes case.  When the conversation

73

turned to the death penalty, Mayberry said, "you don't want my views on the death penalty" because "that usually causes a lot of conflict." The juror, however, said nothing about the death penalty.

Juror No. 24777 denied that any of these conversations had ever taken place. She did recall someone asking if she would have a difficult time deciding a death penalty case. She testified that she responded that she would "have to listen to what the judge told me, what the law said, and what the facts were." The trial court found Hash to be "less than credible" but that Juror No. 24777's testimony was entirely credible and that she had not discussed the case with the witnesses. It further concluded that even if the conversations reported by Ferreria and Mayberry took place, there was no evidence of "any misconduct which could result in prejudice"; Juror No. 24777 had merely identified herself as a juror on a particular case.

When a trial court denies a motion for new trial based on juror misconduct, "the reviewing court should accept the trial court's factual findings and credibility determinations if they are supported by substantial evidence, but must exercise its independent judgment to determine whether any misconduct was prejudicial." (*People v. Dykes* (2009) 46 Cal.4th 731, 809; see also *People v. Gamache, supra,* 48 Cal.4th at p. 386.) Here, the trial court's conclusions that the juror was credible, and Hash was not, are supported by substantial evidence. The trial court had observed the juror not only while she testified but also throughout the trial. Hash, on the other hand, appeared less than credible, not only based on her demeanor but also on the fact that she had two felony convictions and that she had a friendship with two of defendant's friends. Neither of the other two witnesses, Ferreria and Mayberry, corroborated Hash's most damaging allegation — that the juror stated that defendant was likely to get the death penalty. The trial court did

74

not err in concluding that the juror had not discussed the case with the witnesses and consequently that defendant failed to establish any prejudicial misconduct.

### S. Cumulative error

Defendant contends that the guilt, special circumstances, and penalty verdicts should be reversed based on the cumulative effect of the prejudice resulting from all alleged errors, even if each is not prejudicial in itself. We have found no error and have presumed error only as to the trial court's exclusion of certain hearsay statements of Wilson, which we found not to be prejudicial. Consequently, there is nothing to cumulate and hence there can be no cumulative prejudice.

### T. Waiver of jury trial on prior conviction allegations

Defendant contends that the trial court's true findings on certain noncapital sentencing allegations must be vacated because his waiver of jury trial was involuntary. The information charged defendant with a number of noncapital sentencing allegations, including allegations that he was on parole (§ 1203.085, subd. (b)) and that he had served four prior prison terms (§ 667.5, subd. (b)). Prior to trial, defense counsel moved to bifurcate proceedings on these allegations and offered to waive jury trial. The trial court received defendant's waiver of jury trial on these allegations. Subsequently, during guilt phase deliberations, the court and defense counsel reviewed the transcript of defendant's waiver and agreed that the waiver was sufficient and no further advisements need be given. The allegations were tried to the court, which found that defendant had been convicted of one serious or violent felony within the meaning of the Three Strikes law and had served four prior prison terms. Based on these findings, the trial court doubled defendant's sentence under the Three Strikes law for the offense of unlawful

75

driving or taking of a vehicle, and imposed four one-year terms for the four prior prison term enhancements.

Defendant contends that his waiver of jury trial on the allegations was invalid because the court and counsel informed him that he was required to waive his right to a jury trial in order to avoid having the jury be exposed to evidence of his criminal history at the guilt phase. This advisement was misleading, defendant contends, because defendant could have retained his right to a jury trial and the trial court could have bifurcated trial on the sentencing allegations, so that the jurors would not hear evidence of his history until after they had decided his guilt on the substantive charges. (See *People v. Calderon* (1994) 9 Cal.4th 69, 72.)

Defendant has forfeited this claim based on his failure to object in the trial court. "[T]he deprivation of the statutory right to jury trial on the prior prison term allegations does not implicate the state or federal constitutional right to jury trial. Absent an objection to the discharge of the jury or commencement of court trial, defendant is precluded from asserting on appeal a claim of ineffectual waiver of the statutory right to jury trial of prior prison term allegations." (*People v. Vera* (1997) 15 Cal.4th 269, 278; see *People v. Towne* (2008) 44 Cal.4th 63, 74-79 [federal constitutional right to a jury trial does not extend to allegations that a defendant has suffered a prior conviction or served a prior prison term].) Here, after reviewing the transcript of defendant's waiver, defense counsel expressly agreed with the trial court that defendant's waiver was sufficient.

Furthermore, the claim fails on the merits. There is no evidence in the record that defense counsel advised defendant that trial on the sentencing allegations could not be bifurcated unless defendant waived his right to a jury trial. The record does not show what advice counsel gave to defendant. There was a brief pause in the proceedings while defendant consulted with counsel before hearing the trial court's advisements and waiving jury trial on the allegations. The

76

trial court explained to defendant that "your attorneys have indicated they want this jury, when this jury is deciding the issue of whether or not the People have proven the charges against you beyond a reasonable doubt, to be influenced in any way by also considering the allegations of these prior felony convictions and related matters. . . . In order to avoid having the jury deal with that issue, your attorneys are recommending to you, apparently, that you waive your right to have the jury decide that issue, and that you have those issues, as to each one of these prior special allegations, be decided solely by the court." Contrary to defendant's contention, the court never stated that waiving jury trial was the only way that defendant could avoid exposing the jury to his criminal history during the guilt phase. Rather, the court stated only that waiving jury trial was the means that defendant's attorneys were recommending to avoid such exposure. That statement was not incorrect or misleading, and does not render defendant's waiver involuntary.

### U. Sufficiency of evidence to prove four prior prison term allegations

Defendant claims the trial court improperly imposed four one-year enhancements for service of prior prison terms when the evidence showed that he had served only three separate prison terms. Section 667.5, subdivision (b), provides an additional penalty of one year "for each prior separate prison term . . . imposed . . . for any felony." A prior separate prison term is "a continuous completed period of prison incarceration imposed for the particular offense alone or in combination with concurrent or consecutive sentences for other crimes . . . ." (§ 667.5, subd. (g).) "[T]his statutory language means that only one enhancement is proper where concurrent sentences have been imposed in two or more prior felony cases." (*People v. Jones* (1998) 63 Cal.App.4th 744, 747.)

77

As respondent concedes, the evidence shows that defendant served consecutive terms on two of the four felony convictions alleged — his convictions for being a felon in possession of a firearm and escape (Stanislaus County case Nos. 265702 & 265697). Accordingly, the terms served for these offenses were not "separate" terms within the meaning of section 667.5, subdivision (b). Therefore, the trial court's true finding on one of the section 667.5, subdivision (b), allegations must be vacated and defendant's determinate sentenced modified by striking the additional one-year sentence.

### III. CONCLUSION

The judgment is modified to vacate the trial court's true finding on one of the section 667.5, subdivision (b), allegations and to strike the additional one-year sentence for that allegation. In all other respects, the judgment is affirmed.


**CANTIL-SAKAUYE, C. J.**

**WE CONCUR:**

**CHIN, J.**
**CORRIGAN, J.**
**BAXTER, J.**\*

---

**\*** Retired Associate Justice of the Supreme Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

**CONCURRING AND DISSENTING OPINION BY WERDEGAR, J.**

I agree with the majority that (1) despite omissions in the Attorney General's briefing, section 13 of article VI of the California Constitution requires we address the prejudice, if any, flowing from the trial court's decision to exclude hearsay statements John Morris made to Misty Abbott and Albert Lawson (maj. opn., *ante*, at p. 33); and (2) any error in excluding that evidence was harmless at the guilt phase. Unlike the majority, however, I find the trial court abused its discretion by excluding the aforesaid evidence, and that the error prejudiced defendant at the penalty phase of his trial. Consequently, I dissent from that part of the majority opinion.

## I.

As the majority explains, a hearsay statement—that is, a statement made outside of court that is offered in evidence for its truth—may be admitted into evidence despite the rule against hearsay if it satisfies the requirements in Evidence Code section 1230. That section permits the admission of hearsay if the declarant is unavailable and "the statement, when made, . . . so far subjected him to the risk of civil or criminal liability . . . that a reasonable man in his position would not have made the statement unless he believed it to be true." Although as a general rule a trial court's ruling on a hearsay question will be affirmed on appeal absent an abuse of discretion, in this case I conclude the trial court erred under Evidence Code section 1230 in excluding Morris's statements to Abbott and

1

to Lawson.  Regarding Morris's statement to Misty Abbott that defendant did not take part in the actual killing of Betty Bone, and that upon seeing Morris killing her, he (defendant) looked at Morris as if to say " 'what in hell are you doing, dude' " (maj. opn., *ante*, at p. 24), the clear implication is that killing Bone was not part of the group's plan, and that Morris acted on his own.  This statement tends to exculpate defendant (because it suggests he did not intend the victim to be killed), and clearly inculpates the declarant Morris (because he admits he personally killed Bone).  As Justice Liu opines in part I of his separate opinion: "Had Morris been tried for capital murder, evidence that his conduct was so egregious as to surprise even his confederates would be relevant to the jury's determination of what penalty to impose on him."  (Conc. & dis. opn. of Liu, J., *post*, at p. 5.)  More to the point, a reasonable man would not have rendered himself vulnerable to the death penalty by making such a statement unless it were true.  (Evid. Code, § 1230.)

The same reasoning applies to the second excluded statement.  Albert Lawson would have testified that, while jointly incarcerated with Morris in county jail, Morris told him that defendant and Wilson had joined him in Bone's house " 'but took no part in the actual killing.' "  (Maj. opn., *ante*, at p. 24.)  By assuming sole responsibility for Bone's murder, Morris inculpated himself and tended to exculpate his codefendants.  The majority agrees, reasoning that "[s]tatements indicating that [Morris] was the sole killer could [have] subject[ed] [him] to a risk of increased criminal liability by establishing aggravating circumstances of the crime."  (*Id*., p. 30; see conc. & dis. opn. of Liu, J., *post*, at p. 6.)  Again, a reasonable man would not have made such a statement unless it were true.  (Evid. Code, § 1230.)

I agree with Justice Liu the trial court abused its discretion in excluding the statements because "[u]nder any reasonable reading, the excluded statements

tended to inculpate Morris, and their reliability is buttressed by their consistency and the absence of any discernible reason for Morris to lie." (Conc. & dis. opn. of Liu, J., *post*, at pp. 6–7.) The evidence of defendant's guilt of felony murder being overwhelming, however, I agree with the majority this error did not result in a miscarriage of justice at the guilt phase of trial. (Cal. Const., art. VI, § 13; *People v. Watson* (1956) 46 Cal.2d 818, 836–837.) I reach a different conclusion concerning the effect of the error at the penalty phase of defendant's trial.

## II.

This court first set forth the applicable standard of review for penalty phase errors in a capital trial in *People v. Brown* (1988) 46 Cal.3d 432. In that case, we explained "that state law error occurring at the penalty phase must be assessed on appeal by asking whether it is *reasonably possible* the error affected the verdict." (*People v. Abilez* (2007) 41 Cal.4th 472, 525–526, italics added; see *Brown*, *supra*, at p. 448.) We have since explained the *Brown* standard is the same in substance and effect as that set forth for federal constitutional error in *Chapman v. California* (1967) 386 U.S. 18, 24; "that is, that reversal is required unless it is shown the error was harmless beyond a reasonable doubt." (*Abilez*, *supra*, at p. 526.) " 'The beyond-a-reasonable-doubt standard of *Chapman* "requir[es] the beneficiary of a [federal] constitutional error to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." (*Chapman*, *supra*, 386 U.S. at p. 24.) "To say that an error did not contribute to the ensuing verdict is . . . to find that error unimportant in relation to everything else the jury considered on the issue in question, as revealed in the record." (*Yates v. Evatt* (1991) 500 U.S. 391, 403.) Thus, the focus is what the jury actually decided and whether the error might have tainted its decision. That is to say, the issue is "whether the . . . verdict actually rendered in this trial was surely unattributable to the error." (*Sullivan v.*

3

*Louisiana* (1993) 508 U.S. 275, 279.)' " (*People v. Pearson* (2013) 56 Cal.4th 393, 463.)

Applying this rigorous standard of review, I agree with Justice Liu that "it is reasonable to think that the jury's determination of whether Grimes deserved the death penalty turned significantly on whether he played a leadership role in the killing and what his attitude or reaction to the killing was." (Conc. & dis. opn. by Liu, J., *post*, at p. 27.) Although the prosecution presented defendant's prior criminal behavior as aggravating evidence, the defense met that evidence with mitigating evidence detailing defendant's dysfunctional childhood, mental problems, possible intellectual disability, brain damage and schizophrenia. Victim impact evidence from the surviving family was met with evidence from defendant's sister, mother, ex-wife and others proclaiming their love for defendant. Evidence suggesting defendant lacked remorse over Bone's murder was counterbalanced with defense evidence that defendant was the only one to have come to the aid of a prisoner being assaulted by others, and evidence describing a traumatic incident in which defendant's fiancée was killed in a traffic accident when defendant went to the aid of her mother, who was being harassed by the mother's ex-husband.

Given this relative equipoise of evidence at the penalty phase and the undisputed fact that defendant did not personally kill Betty Bone, defendant's actual role in the events leading to her death was likely a critical factor in the jury's penalty phase calculus. Accordingly, we must ask: what evidence before the jury was relevant to determining defendant's role in the murder? Deputy O'Connor testified that inmate Jonathon Howe told him that while incarcerated together in the Shasta County Jail in 1998, defendant told Howe that because Bone had seen them, defendant ordered Morris and Wilson to kill her. (Howe himself was more equivocal, testifying that his memory of his interview with Deputy

4

O'Connor had faded.)  The prosecutor drew a line under this point in closing argument, saying the defense has "never given you a reason to doubt [Howe's] testimony."

As we now know, however, evidence casting doubt on Howe's account existed in the form of John Morris's out-of-court statements to Misty Abbott and to Albert Lawson, evidence excluded by the trial court.  Had the jury heard evidence suggesting that Morris decided on his own to kill the victim, and that defendant and Wilson expressed surprise at his actions, the jury may well have questioned Howe's assertion that defendant had taken a leadership role among the criminal trio.  And as Justice Liu further explains (conc. & dis. opn. by Liu, J., *post*, at pp. 27–28), had the jury heard Morris's statements that defendant was in another part of Bone's house during her murder and that he appeared shocked upon seeing the murder, the jury may also have questioned Howe's further assertion that defendant enjoyed watching Morris strangle and then stab the victim, and that defendant "enjoyed the fact she died."  Given Howe's professed lack of memory and his many pending felony and misdemeanor charges, as well as the suggestion in the record of the benefits he received for his testimony (in the form of dismissed enhancements and the like), admission of Morris's out-of-court statements would likely have been decisive in convincing the jury to disregard Howe's rather equivocal evidence.

5

On this record, I find "there is a reasonable (i.e., realistic) possibility that the jury would have rendered a different verdict" on penalty had the trial court admitted the out-of-court statements Morris made to Abbott and Lawson. (*People v. Brown*, *supra*, 46 Cal.3d at p. 448.) In other words, I find the error was not harmless beyond a reasonable doubt. (*People v. Abilez*, *supra*, 41 Cal.4th at pp. 525–526.) Although I concur in the affirmance of the guilt phase judgment, I dissent from the majority's affirmance of defendant's penalty phase judgment.

**WERDEGAR, J.**

**CONCURRING AND DISSENTING OPINION BY LIU, J.**

Ninety-eight-year-old Betty Bone was killed during a home invasion robbery committed by defendant Gary Lee Grimes and two confederates, Patrick James Wilson and John Morris. Morris committed suicide shortly after his arrest; he was never tried. According to witness Misty Abbott, Morris told her on the day of the crime that he (Morris) killed Bone by strangling and then stabbing her. This statement was admitted at trial. But the trial court refused to admit other statements by Morris. The trial court excluded Morris's statements to Abbott that Grimes "did not take part in the killing," that Grimes had not "participated in the killing," and that after he (Morris) killed Bone, Grimes and Wilson "looked at him as if they were saying, what in the hell are you doing, dude." The trial court also excluded Morris's statement to his cellmate, Albert Lawson, that Grimes was "in the house but took no part in the actual killing and [was] in some other place in the house."

In this appeal, Grimes devoted 18 pages of his opening brief to arguing that the trial court erred in excluding these statements because they were admissible as declarations against Morris's interest under Evidence Code section 1230. Four of those pages explain that the errors were prejudicial and require reversal of the guilt and penalty verdicts. The subheading of this latter discussion reads, "Because The State Will Be Unable To Prove The Exclusion Of Morris's Statements Harmless, Reversal Is Required."

1

In her briefing, the Attorney General responded with nine pages arguing that "[t]he trial court did not abuse its discretion or violate appellant's federal constitutional rights by excluding evidence of Morris's out-of-court statements that allegedly exculpated appellant of being Bone's actual killer." Nowhere in this discussion did the Attorney General argue that the exclusion of Morris's statements, if erroneous, was not prejudicial. By contrast, there are many instances elsewhere in her briefing where the Attorney General, after refuting a claim of error, raised harmless error as an additional and alternative argument.

In his reply brief, Grimes again addressed the exclusion of Morris's statements and said: "Respondent does not dispute that if error occurred, reversal of both the special circumstance and penalty phase verdicts is required." In advance of oral argument, Grimes submitted a focus letter to this court, with notice to the Attorney General, indicating that counsel would address the exclusion of Morris's statements at oral argument.

At oral argument, upon questioning by the court, the deputy attorney general acknowledged that "the harmless error was omitted from our briefing" but then proceeded to argue, for the first time, that any error in excluding Morris's statements was harmless. Three weeks later, this court on its own motion invited the parties to file supplemental briefs on the merits of the harmless error issue and on the effect, if any, of the Attorney General's failure to address the issue. The case was reargued, during which the court asked the deputy attorney general whether she should now be permitted to argue harmless error in light of her failure to do so earlier. The deputy attorney general conceded that if the issue was not properly addressed in her initial briefing — a matter on which there is no real dispute (see Cal. Rules of Court, rule 8.204(a)(1)(B)) — then "[y]ou shouldn't be hearing from me" on the issue.

2

In the face of these irregularities, today's opinion finds no legal or practical significance in the Attorney General's failure to address harmless error. Not only does the court assign no consequence to the Attorney General's omission, but the court, acting on its own initiative, invited the Attorney General to rectify her omission through supplemental briefing. This approach cannot be squared with elemental notions of fair play and this court's role as a neutral arbiter in the adversarial process. With today's opinion, we are saying to the Office of the Attorney General, the most experienced litigant in California's appellate courts: "Don't worry if you fail to argue harmless error because we will give you a second bite at the apple."

Because article VI, section 13 of the California Constitution prohibits reviewing courts from reversing a judgment without undertaking harmless error analysis, I agree that "the Attorney General's failure to respond to defendant's harmless error argument does not relieve this court of its responsibility to determine whether any error was harmless." (Maj. opn., *ante*, at p. 31.) In making this determination, however, I would take into account the Attorney General's forfeiture by adapting a well-developed body of federal case law on this issue. As explained below, no authority supports this court's approach of inviting and considering belated arguments on harmless error when the government, in response to a defendant's clearly stated claim of prejudice, does not address the issue. Instead, harmless error analysis must be based on the record and arguments that are properly before the reviewing court. (See *Carducci v. Regan* (D.C. Cir. 1983) 714 F.2d 171, 177 (Scalia, J.) ["The premise of our adversarial system is that appellate courts do not sit as self-directed boards of legal inquiry and research, but essentially as arbiters of legal questions presented and argued by the parties before them."].) Ultimately, where the harmlessness of an error under the

3

applicable legal standard is seriously debatable, a court should not find the error harmless on its own initiative.

In this case, the trial court erred in excluding Morris's statements to Abbott and Lawson because they were clearly admissible as statements against Morris's penal interests. Applying the proper legal standards for harmless error in a capital trial, I find the error unquestionably harmless as to Grimes's guilt of special circumstance murder. But I do not believe the error can be deemed harmless as to the penalty verdict because the excluded statements were crucial to rebutting the principal evidence of Grimes's leadership and depravity with respect to the killing. I therefore dissent from the affirmance of the death judgment.

## I.

I begin by explaining why it was error for the trial court to exclude Morris's statements to Abbott and Lawson. Evidence Code section 1230 allows for the admission of hearsay that "so far subjected [the declarant] to the risk of civil or criminal liability" that "a reasonable man in his position would not have made the statement unless he believed it to be true." A party seeking to introduce an out-of-court statement pursuant to this exception must show that "the declarant is unavailable, that the declaration was against the declarant's penal interest, and that the declaration was sufficiently reliable to warrant admission despite its hearsay character." (*People v. Cudjo* (1993) 6 Cal.4th 585, 607.) We review a trial court's ruling on the admissibility of evidence pursuant to section 1230 for abuse of discretion. (*People v. Valdez* (2012) 55 Cal.4th 82, 143.)

Evidence Code section 1230 does not apply to " ' "any statement or portion of a statement not itself specifically disserving to the interests of the declarant." ' [Citation.]" (*People v. Lawley* (2002) 27 Cal.4th 102, 153 (*Lawley*).) In certain circumstances, a statement may specifically disserve the declarant's interest by exculpating an accomplice. (See *Chia v. Cambra* (9th Cir. 2004) 360 F.3d 997,

4

1005 [statement that "simultaneously" inculpated declarant and exculpated defendant was admissible as a statement against interest]; *U.S. v. Paguio* (9th Cir. 1997) 114 F.3d 928, 933 ["In context, the father's statement that his son had nothing to do with [the crime] was inculpatory of the father as well as exculpatory of the son."].)  Whether a statement that exculpates a defendant is admissible as a statement against the declarant's interest depends on the context in which the statement was made.  (*Paguio*, at pp. 933–934.)  " 'Thus a statement admitting guilt and implicating another person, made while in custody, may well be motivated by a desire to curry favor with the authorities and hence fail to qualify as against interest. . . .  On the other hand, the same words spoken under different circumstances, *e.g.*, to an acquaintance, would have no difficulty in qualifying.' "  (*Williamson v. United States* (1994) 512 U.S. 594, 601–602, quoting Advisory Com. Notes, Fed. Rules Evid., rule 804(b)(3), (28 U.S.C.); see *Lawley*, at p. 153 ["Whether a statement is self-inculpatory or not can only be determined by viewing the statement in context."].)

Morris's statement to Abbott indicates at the least that Grimes and Wilson were "surprised or alarmed" by Morris's actions.  (Maj. opn., *ante*, at p. 29.)  Although Morris's statement did not specify the reason for their surprise, any reasonable interpretation of such a reaction inculpates Morris.  Surprise at *the fact of the killing* would undermine the inference that Grimes ordered or otherwise participated in the decision to kill Bone; it would instead support an inference that Morris made the decision to do so on his own.  Surprise at *the circumstances of the killing* would suggest that Morris acted on his own initiative in choosing a gruesome way of killing Bone.  Had Morris been tried for capital murder, evidence that his conduct was so egregious as to surprise even his confederates would be relevant to the jury's determination of what penalty to impose.  (See Pen. Code, § 190.3, subd. (a); *People v. Bunyard* (2009) 45 Cal.4th 836, 859 ["section

5

190.3, factor (a) is concerned with those circumstances that make a murder especially aggravated, and therefore make a defendant more culpable and deserving of the ultimate penalty"].)

Morris's statement to Lawson also stressed Morris's personal responsibility for the killing, undermining any inference that he drew tacit support or approval from Grimes's presence, oversight, or counsel. Had Morris faced trial, this evidence would have impaired his ability to argue that he was simply following orders or acting according to someone else's plan, or to later deny that he alone committed the act of killing. Like his statement to Abbott, Morris's statement to Lawson would have undermined his ability to distribute blame across the group.

Although today's opinion acknowledges as much (see maj. opn., *ante*, at p. 30 ["Statements indicating that the declarant was the sole killer could subject the declarant to a risk of increased criminal liability by establishing aggravating circumstances of the crime."]), the court reasons that because Morris had already told Abbott that he choked and stabbed Bone to death, his statements to Abbott and Lawson that Grimes took no part in the killing were not sufficiently self-inculpatory to guarantee its reliability. But there is no indication in the record that Morris said he acted alone or without assistance in his earlier admission to Abbott. Nor is there any reason to think Morris was speaking with such analytical precision that, having realized he had already implicated himself as the sole killer in an earlier conversation with Abbott, he felt he had nothing to lose by later saying, falsely, that he killed Bone without the presence, participation, or support of his confederates. If anything, the consistency between the excluded statements and Morris's earlier confession to Abbott renders the excluded statements more reliable, not less.

Under any reasonable reading, the excluded statements tended to inculpate Morris, and their reliability is buttressed by their consistency and the absence of

6

any discernible reason for Morris to lie.  Accordingly, I would hold that the trial court abused its discretion in excluding these statements.

## II.

Today's opinion declines to decide whether the trial court improperly excluded Morris's statement to Lawson and instead concludes that any error was harmless beyond a reasonable doubt as to the guilt and penalty verdicts, even though "[t]he Attorney General did not argue, in her answer brief, that any error in the exclusion of Morris's hearsay statements was harmless." (Maj. opn., *ante*, at p. 31.)  I agree that article VI, section 13 of the California Constitution obligates us to address harmless error despite the government's forfeiture.  But having found that the Attorney General did not argue harmless error, we should not have invited supplemental briefing on the issue.  In so doing, the court gave the government an unwarranted second bite at the apple.

"In our adversary system, in both civil and criminal cases, in the first instance and on appeal, we follow the principle of party presentation.  That is, we rely on the parties to frame the issues for decision and assign to courts the role of neutral arbiter of matters the parties present. . . .  [A]s a general rule, '[o]ur adversary system is designed around the premise that the parties know what is best for them, and are responsible for advancing the facts and arguments entitling them to relief.' " (*Greenlaw v. United States* (2008) 554 U.S. 237, 243–244 (*Greenlaw*).)  The court's neutrality, in appearance and reality, is crucial to its legitimacy and to the overall functioning of the judicial system.  (See *Broadman v. Commission on Judicial Performance* (1998) 18 Cal.4th 1079, 1100 ["Judges . . . cannot be advocates for the interests of any parties; they must be, and be perceived to be, neutral arbiters of both fact and law [citation] who apply the law uniformly and consistently."].)

These adversarial principles are evident in the procedural rules that govern day-to-day practice before our court. For example, if an appellant fails to file an opening brief, the appeal is subject to dismissal. (Cal. Rules of Court, rule 8.360(c)(5)(A).) If a respondent fails to file a response, the court "will decide the appeal on the record, the opening brief, and any oral argument by appellant." (*Id.*, rule 8.360(c)(5)(B).) The same is true if a party does not show up for oral argument. (Pen. Code, § 1253.) A party forfeits an argument by failing to raise it in the opening brief. (See *People v. Tully* (2012) 54 Cal.4th 952, 1075 ["It is axiomatic that arguments made for the first time in a reply brief will not be entertained because of the unfairness to the other party."].) Even a claim that a party explicitly asserts may be disregarded if it is briefed in a perfunctory or conclusory manner. (See *People v. Barnett* (1998) 17 Cal.4th 1044, 1182 [claim presented without "adequate" supporting legal argument was "not properly raised"]; *People v. Williams* (1997) 16 Cal.4th 153, 206 ["Points 'perfunctorily asserted without argument in support' are not properly raised."]; *People v. Mayfield* (1993) 5 Cal.4th 142, 196 ["Defendant's constitutional claims largely are asserted perfunctorily and without argument in support. Therefore we do not consider them."].) These forfeiture rules apply to a criminal defendant whose opening brief does not explain how an asserted error resulted in prejudice. (See *People v. Hill* (1992) 3 Cal.4th 959, 996 (*Hill*); *Adams v. MHC Colony Park Limited Partnership* (2014) 224 Cal.App.4th 601, 614.)

Procedural rules of this sort are designed to promote the fair and orderly administration of justice. They serve this function when applied evenhandedly to all parties, regardless of whether compliance is more difficult for some parties or whether compliance is strictly necessary to the court's resolution of a particular claim. Thus, forfeiture rules generally apply to the government in the same manner and to the same extent that they apply to criminal defendants. (See *Wilson*

8

*v. O'Leary* (7th Cir. 1990) 895 F.2d 378, 384 (*O'Leary*) ["Procedural rules apply to the government as well as to defendants."]; *Calvert v. Wilson* (6th Cir. 2002) 288 F.3d 823, 835–836 (conc. opn. of Cole, J.) ["While a petitioner has the responsibility of ensuring that all claims in support of a petition for writ of habeas corpus are timely raised, so too does the warden bear the responsibility of ensuring all defenses, including harmless error, are timely raised."]; *Rose v. United States* (D.C. 1993) 629 A.2d 526, 537 (*Rose*) ["[A]lthough the public is entitled to have valid judgments of conviction sustained, the public ordinarily must be bound by the actions of its counsel, just as a criminal defendant normally is. That is how the adversary system works."].)

In the criminal context, there is an additional reason why courts must hew carefully to their role as neutral arbiters. Within our system of divided government, the "prosecution of criminal offenses on behalf of the People is the sole responsibility of the public prosecutor." (*Dix v. Superior Court* (1991) 53 Cal.3d 442, 451; see Pen. Code, § 684; Gov. Code, §§ 100, subd. (b), 26500.) The judiciary, by contrast, has no constitutional or statutory authority to represent the people in criminal prosecutions. (*Steen v. Appellate Division, Superior Court of Los Angeles County* (2014) 59 Cal.4th 1045, 1052, 1053–1054.) Prosecutorial discretion includes deciding "whom to charge, what charges to file and pursue, and what punishment to seek," as well as "the *conduct* of a criminal action once commenced." (*Dix*, at pp. 451–452.) Defending or not defending a conviction on the basis of harmless error is an exercise of prosecutorial "responsibility to decide in the public interest whether to seek, oppose, accept, or challenge judicial actions and rulings." (*Id.* at p. 452.) Such a decision reflects a prosecutorial judgment as to whether, without the benefit of the error, the case should have gone forward, would have satisfied the burden of proof, or would have served the interests of justice. If the government "has . . . assumed its traditional role of advocate" by

9

"vigorously argu[ing] for affirmance" and "has selected the arguments it believes are best suited to achieve that end," then "the adversary system should be allowed to function as such," and courts should not "automatically . . . act as an institutional failsafe to make sure that the government has not compromised its prosecutorial responsibility." (*Rose*, *supra*, 629 A.2d at p. 534.)

In this case, the Attorney General "has vigorously argued for affirmance" and "has selected the arguments it believes are best suited to achieve that end." (*Rose*, *supra*, 629 A.2d at p. 534.) Her answer brief argues harmless error in response to several issues raised by Grimes, but not in response to the claim that the trial court improperly excluded Morris's statements. Thus, the Attorney General has forfeited the opportunity to make that argument. Her forfeiture cannot turn on whether the failure to make the argument was intentional or inadvertent, for we do not engage in such inquiry when applying forfeiture rules to criminal defendants on direct appeal. How could we make such a factual determination in the course of an appellate proceeding, anyway? Would we have to appoint a referee to consider a sworn declaration from the Attorney General or her delegates? Or hear live testimony? In this case, the names of five attorneys appear on the government's brief: the Attorney General, a chief assistant attorney general, a senior assistant attorney general, a supervising deputy attorney general, and a deputy attorney general. Would we have to inquire of one of them? Some of them? Or all of them?

Moreover, it does not matter whether an omitted claim happens to surface later on. In this case, the Attorney General did not respond in her briefing to Grimes's argument that the error was prejudicial, did not indicate that she would focus on this issue at oral argument, and did not raise the issue at oral argument. The deputy attorney general addressed harmless error only in response to a question from the bench. At that point, the deputy attorney general insisted that

10

the failure to brief the issue "wasn't an act of forfeiting such a claim" and proceeded to argue, for the first time, that any error was harmless. But the fact that the deputy attorney general said the omission was unintended — along with the fact that her harmless error argument is now before us in supplemental briefing — is sheer happenstance. Had the court not inquired, or had Grimes not focused his oral argument on this particular issue, we would have had no basis to believe the omission was inadvertent. Such fortuities should not guide our approach.

Today's opinion says, "We have occasionally exercised our discretion to permit defendants to file supplemental briefs raising new issues in capital appeals." (Maj. opn., *ante*, at p. 36, citing *People v. Howard* (2010) 51 Cal.4th 15, 26, 30, fn. 6, 33, and *People v. Carrington* (2009) 47 Cal.4th 187 and docket entries, case No. S043628.) But the two cited instances involved unusual circumstances that have no analog here. In *Howard*, we allowed the defendant to raise new issues in supplemental briefing because a new lawyer had taken over and reexamined the defendant's appeal after the completion of briefing. (See Mot. for Permission to File Supp. Br. (Feb. 6, 2008) *People v. Howard* (S050583), p. 3.) In *Carrington*, the new issue addressed by the defendant was not really new; it had been raised in the government's brief as a meritorious noncapital issue warranting relief. (See Mot. for Leave to File Supp. Br. (Oct. 7, 2005) *People v. Carrington* (S043628), p. 2.) And our published opinion in *Carrington* does not mention, much less approve, the belated presentation of new arguments. If anything, the atypical situations in *Howard* and *Carrington* suggest they were exceptions to our general rule. Moreover, in both cases we allowed supplemental briefing in response to the defendant's request; we did not invite the defendant to address a previously neglected issue on our own initiative, as we have done with the Attorney General in this case.

11

The principles above readily establish that the Attorney General forfeited the issue of harmless error in this case. Having failed to address Grimes's claim of prejudice in her answer brief, she had no further entitlement to argue the issue. As the deputy attorney general conceded at reargument, "You shouldn't be hearing from me" on harmless error. In light of the government's forfeiture, our ordinary posture of impartiality should have restrained us from soliciting and considering supplemental briefing on our own initiative.

### III.

I now consider how the government's failure to argue harmless error affects the treatment of that issue by an appellate court. A substantial body of federal case law has addressed this question and provides helpful guidance for how we should approach this case. Although I agree with today's opinion that the California Constitution requires us to address harmless error, the government's omission is not, as the court suggests, without consequence to the analysis or outcome.

### A.

The government's failure to argue harmless error has occurred with some frequency in the federal courts of appeals. Two provisions of law codify a harmless error rule binding on federal courts. Rule 52(a) of the Federal Rules of Criminal Procedure says: "Any error, defect, irregularity, or variance that does not affect substantial rights must be disregarded." And section 2111 of title 28 of the United States Code says: "On the hearing of any appeal or writ of certiorari in any case, the court shall give judgment after an examination of the record without regard to errors or defects which do not affect the substantial rights of the parties." The mandatory language of these provisions directs federal courts to disregard errors that do not affect substantial rights. But no federal court has read these provisions to require consideration of harmless error when the government has not

12

raised it.  That is because, as one leading case explains, mandatory language "is a general feature of legal rules, and does not make their provisions nonwaivable. Specific rules of conduct or procedure are promulgated against a backdrop of understandings concerning the procedure for invoking the benefits of rules, or for waiving those benefits."  (*U.S. v. Giovannetti* (7th Cir. 1991) 928 F.2d 225, 226 (*Giovannetti*).)

Some cases have held that when the government fails to argue harmless error, a finding of error simply results in reversal without inquiry into prejudice. (See *U.S. v. Cacho-Bonilla* (1st Cir. 2005) 404 F.3d 84, 90; *U.S. v. Varela-Rivera* (9th Cir. 2002) 279 F.3d 1174, 1180; *O'Leary*, *supra*, 895 F.2d at p. 384; see also *United States v. Pryce* (D.C. Cir. 1991) 938 F.2d 1343, 1352–1353 (*Pryce*) (conc. & dis. opn. of Silberman, J.).)  The dominant view in federal case law, however, is that courts have discretion to determine whether an error is harmless despite the government's failure to raise the issue.  In deciding whether to exercise that discretion, many courts have followed the Seventh Circuit's guidance in *Giovannetti* that "the controlling considerations are the length and complexity of the record, whether the harmlessness of the error or errors found is certain or debatable, and whether a reversal will result in protracted, costly, and ultimately futile proceedings in the district court."  (*Giovannetti*, *supra*, 928 F.2d at p. 227; see *U.S. v. Hunter* (D.C. Cir. 2014) 554 Fed.Appx 5, 11–12 [following *Pryce*, *supra*, 938 F.2d at p. 1348 (lead opn. of Williams, J.)]; *Gover v. Perry* (6th Cir. 2012) 698 F.3d 295, 300–301 (*Gover*); *U.S. v. Gonzalez-Flores* (9th Cir. 2005) 418 F.3d 1093, 1100 (*Gonzalez-Flores*); *U.S. v. Torrez-Ortega* (10th Cir. 1999) 184 F.3d 1128, 1136 (*Torrez-Ortega*); *U.S. v. McLaughlin* (3d Cir. 1997) 126 F.3d 130, 135; *Lufkins v. Leapley* (8th Cir.1992) 965 F.2d 1477, 1481; see also *U.S. v. Rose* (1st Cir. 1997) 104 F.3d 1408, 1415 [finding *Giovannetti* factors relevant but not exhaustive].)

13

As these cases have explained, "the dangers of allowing sua sponte consideration of harmlessness . . . include the potential burden on reviewing courts of searching the record without guidance from the parties and encouragement of sloppy practice by lawyers." (*Gover*, *supra*, 698 F.3d at p. 300; see *Giovannetti*, *supra*, 928 F.2d at p. 226.) "[T]he practice may unfairly tilt the scales of justice by authorizing courts to construct the government's best arguments for it without providing the defendant with a chance to respond." (*Gonzalez-Flores*, *supra*, 418 F.3d at p. 1101.) " '[W]here the case is at all close, defense counsel's lack of opportunity to answer potential harmless error arguments may lead the court to miss an angle that would have shown the error to have been prejudicial.' " (*Ibid.*, quoting *Pryce*, *supra*, 938 F.2d at p. 1347 (lead opn. of Williams, J.).) At the same time, courts must also consider "the potential costs to third parties and to the system brought about by needless relitigation of cases in which the error did not make any difference." (*Gonzalez-Flores*, at p. 1100; see *Gover*, at p. 301.) To avoid burdening "other users of the court system, whose access to that system is impaired by additional litigation" and "unnecessary court delay," courts may "disregard a harmless error even though through some regrettable oversight harmlessness is not argued" by the government. (*Giovannetti*, at p. 226.)

A review of the case law shows that courts, in determining whether to address harmless error when the government forfeits the issue, focus primarily on how certain or debatable the harmlessness of the error is in light of the record. (See *Gonzalez-Flores*, *supra*, 418 F.3d at p. 1101 ["the court's certainty as to the harmlessness of the error . . . is of particular importance"].) In *Giovannetti*, the Seventh Circuit concluded that "[t]he certainty of harmlessness does not appear with such clarity from an unguided search of the record that we should raise the issue on our own motion." (*Giovannetti*, *supra*, 928 F.2d at p. 227.) In *Torrez-Ortega*, the Tenth Circuit similarly declined to conduct harmless error review "in

14

the complete absence of guidance from the government" where "[t]he harmlessness of the constitutional error is at best debatable" in light of an "extensive and complex" record. (*Torrez-Ortega*, *supra*, 184 F.3d at p. 1136.) Other courts have refused to address harmless error for similar reasons. (See *U.S. v. Davis* (3d Cir. 2013) 726 F.3d 434, 445, fn. 8 (*Davis*); *U.S. v. Kloehn* (9th Cir. 2010) 620 F.3d 1122, 1130–1131; *U.S. v. Davis* (D.C. Cir. 2010) 596 F.3d 852, 861; *U.S. v. Silva* (7th Cir. 2004) 380 F.3d 1018, 1021; *U.S. v. Samaniego* (10th Cir. 1999) 187 F.3d 1222, 1225–1226.)

Where courts have decided to address harmless error on their own initiative, some have found the error prejudicial. (See *U.S. v. Hatfield* (7th Cir. 2010) 591 F.3d 945, 951; *U.S. v. Montgomery* (8th Cir. 1996) 100 F.3d 1404, 1407; *U.S. v. Rodriguez Cortes* (1st Cir. 1991) 949 F.2d 532, 543.) Others have found the error harmless. (See *U.S. v. Brooks* (9th Cir., Nov. 24, 2014, No. 13-10146) __ F.3d __, __ [2014 U.S. App. LEXIS 22217, at p. *23] (*Brooks*) [finding error harmless with respect to two convictions but not a third]; *Gover*, *supra*, 698 F.3d at pp. 301–302; *U.S. v. Shavers* (3d Cir. 2012) 693 F.3d 363, 389 (*Shavers*); *U.S. v. Ford* (7th Cir. 2012) 683 F.3d 761, 768–769 (*Ford*); *Gonzalez-Flores*, *supra*, 418 F.3d at p. 1102; *U.S. v. Rose*, *supra*, 104 F.3d at pp. 1414–1415; *Pryce*, *supra*, 938 F.2d at pp. 1348–1350 [finding error harmless with respect to three defendants but not with respect to a fourth].)

As to the latter cases, it is important to note the caution expressed by those courts. The Sixth Circuit in *Gover* said that finding harmless error sua sponte is appropriate "when there is no doubt as to the ultimate result" under the applicable standard or "when the error is harmless upon review of a clear record." (*Gover*, *supra*, 698 F.3d at p. 301.) The Ninth Circuit in *Gonzalez-Flores* similarly observed that a sua sponte finding of harmless error is proper only when "the harmlessness of any error is clear beyond serious debate and further proceedings

15

are certain to replicate the original result." (*Gonzalez-Flores*, *supra*, 418 F.3d at p. 1100; see *Brooks*, *supra*, __ F.3d at p. __ [2014 U.S. App. LEXIS 22217, at p. *24] ["Certainty as to harmlessness is a prerequisite"].) The First Circuit in *United States v. Rose* warned that "[t]he government's case is, of course, put at risk by its failure to argue that admission of the evidence was harmless." (*U.S. v. Rose*, *supra*, 104 F.3d at p. 1415.) And Judge Williams's opinion in *Pryce*, which the D.C. Circuit has subsequently followed, said that "a court should normally conduct the harmless error inquiry on its own initiative only where the relevant portions of the record are reasonably short and straightforward. Moreover, where a court does conduct the inquiry on its own, it should err on the side of the criminal defendant." (*Pryce*, *supra*, 938 F.2d at p. 1348.)

This narrow approach is evident in the analysis of the record in those cases that have found harmless error sua sponte. (See *Brooks*, *supra*, __ F.3d at p. __ [2014 U.S. App. LEXIS 22217, at p. *22] ["overwhelming evidence" of guilt in "a four-day trial" where "the complexity of the record is modest"]; *Gover*, *supra*, 698 F.3d at p. 303 [erroneously admitted testimony "was cumulative of the testimony of others, and was of extremely little weight when compared to the weight of the totality of the evidence admitted against Gover"]; *Shavers*, *supra*, 693 F.3d at p. 389 ["overwhelming evidence" of guilt]; *Ford*, *supra*, 683 F.3d at pp. 767–768 [DNA evidence showed 1 in 29 trillion chance that defendant was not the robber]; *Gonzalez-Flores*, *supra*, 418 F.3d at p. 1102 [finding error "undeniably harmless" where "[t]he record . . . is small and simple," "trial lasted less than two days," "the evidence against [defendant] was overwhelming," "[t]he elements of the crime were easily established," and "Gonzalez put on no defense"]; *U.S. v. Rose*, *supra*, 104 F.3d at p. 1414 [finding error "plainly harmless" where improperly admitted "photograph was cumulative, [and] the weight of the additional evidence overwhelming"].) In *Pryce*, Judge Williams observed that "the record is neither

long nor complicated" and concluded that "the error was indisputably harmless" as to three defendants because "[i]t obviously did not harm" one of them and raised no "serious argument for reversing the convictions of" two others. (*Pryce*, *supra*, 938 F.2d at p. 1348.) As to a fourth defendant, Judge Williams found "the matter . . . open to serious debate" and, on that basis, concluded that reversal was required. (*Id.* at p. 1349.)

In sum, a significant body of case law holds that courts may find harmless error on their own initiative "*only* where the harmlessness of the error is not reasonably debatable." (*Gonzalez-Flores*, *supra*, 418 F.3d at p. 1101; see *Pryce*, *supra*, 938 F.2d at p. 1348 (lead opn. of Williams, J.) ["Where the government does *not* raise the harmless error issue, I would deem errors 'harmless' only where satisfaction of that standard is beyond serious debate."]; *Giovannetti*, *supra*, 928 F.2d at p. 227 [sua sponte finding of harmless error is appropriate "if the harmlessness of the error is readily discernible without an elaborate search of the record"].) Courts have endorsed this approach as striking a proper balance among multiple values: ensuring accurate outcomes, encouraging timely presentation and efficient resolution of harmless error claims, avoiding undue delay and needless relitigation, and maintaining judicial neutrality and fairness in the adversarial process.

**B.**

While acknowledging some of this case law, today's opinion ultimately deems it irrelevant because "the forfeiture rules employed in the federal courts are not binding on this court." (Maj. opn., *ante*, at p. 34.) What is binding is article VI, section 13 of the California Constitution, which says: "No judgment shall be set aside, or new trial granted, in any cause, on the ground of misdirection of the jury, or of the improper admission or rejection of evidence, or for any error as to any matter of pleading, or for any error as to any matter of procedure, unless, after

17

an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice."

The plain meaning of this provision is that a reviewing court may not reverse a judgment without addressing harmless error. It is true that federal courts, despite the mandatory language of the federal harmless error provisions, have held that they have discretion not to address the issue when the government does not raise it. (*Ante*, at p. 15.) But the text of article VI, section 13 differs from the analogous federal provisions in two respects. First, it is phrased as a prohibition: "No judgment shall be set aside, or new trial granted, . . . unless . . . ." Second, it sets forth not only a substantive standard for reversal but also a procedural requirement: a reviewing court must conduct "an examination of the entire cause, including the evidence," before setting aside a judgment. Thus, I agree that "[t]he Attorney General's failure does not relieve this court of its constitutional responsibility to determine whether any error resulted in a miscarriage of justice." (Maj. opn., *ante*, at p. 33.)

I do not agree, however, that the Attorney General's forfeiture makes no difference to our resolution of the harmless error issue. As an initial matter, the fact that article VI, section 13 requires us to address harmless error does not justify our invitation or consideration of the Attorney General's belated views on the subject. Nothing in article VI, section 13 or its enactment history suggests that it was intended to displace the ordinary norms of the adversarial process or the ordinary expectation that the parties will argue the merits of the issue. (See *People v. O'Bryan* (1913) 165 Cal. 55, 63–64 (*O'Bryan*) [discussing history of the provision].) Although article VI, section 13 obligates us to decide the issue, we must decide it without giving special treatment to either party.

It may be argued that having the benefit of the Attorney General's views, even though untimely, is likely to enhance the accuracy of our harmless error

18

inquiry. That is, we are more apt to reach the "correct" result with full information and guidance from an interested party. But the *legally correct* outcome in any case is necessarily shaped by the circumstances of that case, including the evidence presented, the objections made at trial, and the claims raised on appeal, and adherence or lack of adherence to established procedure is a circumstance that properly informs the outcome. When a defendant omits a particular argument in the opening brief and attempts to raise it in the reply brief or at oral argument, we do not typically pardon the oversight for the sake of greater accuracy in determining whether the trial reached the correct result. (See maj. opn., *ante*, at pp. 31–32.) Moreover, the situation here is not unique insofar as harmless error directly concerns the issue of reversal or affirmance, for the import of any procedural rule — the reason procedure matters — is that it may affect the outcome.

Few if any cases are litigated perfectly, and we must decide each case as it comes to us, warts and all. (See *Greenlaw*, *supra*, 554 U.S. at p. 244 [" '[Courts] do not, or should not, sally forth each day looking for wrongs to right. We wait for cases to come to us, and when they do we normally decide only questions presented by the parties.' "].) Tellingly, today's opinion is unable to cite a single instance in which a court has addressed harmless error in the face of a government forfeiture *while also* giving the government a second chance to brief the issue. Courts have rejected such an approach because of its obvious unfairness and the dubious incentive it would provide for careless or manipulative lawyering. (See *Giovannetti*, *supra*, 928 F.2d at pp. 226–227; *Holland v. McGinnis* (7th Cir. 1992) 963 F.2d 1044, 1057–1058.)

What difference, then, does the government's forfeiture make to the merits of the issue? One might argue that it should not make any difference since we can and, under our state Constitution, we must examine the entire record ourselves,

19

even if the task is more burdensome without guidance from the Attorney General. This view, however, overlooks several important considerations.

First, although this court can and does independently canvass the record when assessing prejudice, our reading of the record without guidance from the government provides a necessarily limited window into the dynamics of the case. The record on appellate review often does not illuminate matters of credibility, demeanor, intonation, or emphasis — all of which may affect what evidence the jury found convincing or not. (See, e.g., *Elkins v. Superior Court* (2007) 41 Cal.4th 1337, 1358; *People v. Lewis* (2001) 26 Cal.4th 334, 359; *Meiner v. Ford Motor Co.* (1971) 17 Cal.App.3d 127, 140–141.) It is already imperative, when the issue of harmless error is *fully* litigated by the parties, that reviewing courts exercise caution in reweighing the evidence. (See *O'Bryan*, *supra*, 165 Cal. at p. 66 ["We are not substituted for the jury. We are not to determine, as an original inquiry, the question of the defendant's guilt or innocence."].) This imperative is even greater when the government does not address the issue. A reviewing court's counterfactually constructed understanding of the evidence in support of the jury's verdict may not correspond to how the evidence actually came across to the jury at trial. Aspects of the record that a court finds significant may not have been significant at all; conversely, aspects that a court overlooks or discounts may have been important in real time. Because " '[c]ounsel almost always know a great deal more about their cases than we do' " (*Greenlaw*, *supra*, 554 U.S. at p. 244), a reviewing court must be especially cautious in rejecting a defendant's explanation of prejudice in favor of the court's own narration of the record.

Second, when a reviewing court finds harmless error on its own initiative, it is in effect "construct[ing] the government's best arguments for it without providing the defendant with a chance to respond." (*Gonzalez-Flores*, *supra*, 418 F.3d at p. 1101.) Such an approach " 'may lead the court to miss an angle that

20

would have shown the error to have been prejudicial.' " (*Ibid.*, quoting *Pryce*, *supra*, 938 F.2d at p. 1347 (lead opn. of Williams, J.).)  In this case, the court notes that Grimes was "given adequate notice of the Attorney General's position and an opportunity to respond to it." (Maj. opn., *ante*, at p. 33.)  But that is only because the court improperly invited supplemental briefing from the Attorney General on harmless error.  Properly understood, the posture of Grimes's challenge to the exclusion of Morris's statements is that Grimes has claimed prejudicial error and the Attorney General, while disputing the error, has forfeited the issue of harmlessness.  It is in that posture that we must address harmless error, thus implicating the concerns above.

Third, the significance of the Attorney General's forfeiture must be considered in light of the usual inference that a party's failure to assert a particular claim signals its acquiescence.  (See *People v. Bouzas* (1991) 53 Cal.3d 467, 480; *People v. Isaac* (2014) 224 Cal.App.4th 143, 147, fn. 4; *People v. Carson* (1970) 4 Cal.App.3d 782, 784–785; *Giovannetti*, *supra*, 928 F.2d at p. 226 ["the defendant goes out of his way to argue that the error of which he complains was prejudicial, and the government by not responding signals its acquiescence that if there was error, it indeed was prejudicial"]; *Davis*, *supra*, 726 F.3d at p. 445, fn. 8 ["Such silence usually means that harmless error is waived . . . ."]; *Gonzalez-Flores*, *supra*, 418 F.3d at p. 1100 ["Usually when the government fails to argue harmlessness, we deem the issue waived . . . ."].)  The court cites *Hill* for the proposition that "[w]e do not . . . invariably interpret the failure to respond to an argument as a concession or a forfeiture." (Maj. opn., *ante*, at p. 32, citing *Hill*, *supra*, 3 Cal.4th at p. 995, fn. 3.)  But *Hill* was a case where the claim of error to which the government failed to respond was "itself raised for the first time on appeal" (*Hill*, at p. 995, fn. 3; see *id.* at p. 995 [defendant waived the claim at

21

trial]) and lacked any explanation of why the error was prejudicial (*id.* at p. 996). The same is not true here.

In this case, the Attorney General belatedly contends that her failure to raise harmless error was due to an oversight, not acquiescence. As noted (*ante*, at p. 10), we have no practical way to assess this factual contention on direct appeal. Nor should it matter, unless we are prepared to dispense with the usual inference from silence in favor of now allowing all litigants, not just the Attorney General, to clarify their "actual" position whenever their briefing does not address a particular issue.

Fourth, we must be mindful of the separation of executive and judicial functions in criminal cases. When the government "seeks affirmance based on reasonable appellate strategy" but does not advance a particular argument, the court should hesitate to second-guess the government by advancing that argument in its stead. (*Rose*, *supra*, 629 A.2d at p. 535.) It is true that the government's forfeiture is not binding on this court in light of article VI, section 13. But affirming a judgment on grounds not advocated by the government carries the risk of a "confusion of roles" that is "inconsistent with the neutrality expected of the judiciary in our adversary system of justice." (*Rose*, at p. 535.)

In my view, the considerations above counsel the same approach that federal courts have adopted in this context: When the government fails to argue harmless error, we may find harmless error on our own initiative only when the harmlessness of the error is clear "beyond serious debate." (*Pryce*, *supra*, 938 F.2d at p. 1348 (lead opn. of Williams, J.).) The length and complexity of the record are relevant considerations. But the harmlessness of an error may be readily apparent even on a lengthy record, especially if, for example, the length of the record is due to the volume of evidence against the defendant. At the same time, a close case may come packaged in a clear and simple record. Importantly,

neither the intent nor the effect of the rule I propose is to impose a technical penalty on the government.  Rather, the rule is a means of allocating the risks we face in discharging our obligation to consider harmless error — both the risk of finding an error prejudicial that is actually harmless and the risk of finding an error harmless that is actually prejudicial.  Where harmlessness is clear, the latter risk is negligible; hence the government's forfeiture does not affect the outcome.  But, like Judge Williams in *Pryce*, I would hold that where the harmlessness of an error is seriously debatable, the risk of an inaccurate determination must be borne by the party who forfeited the issue.

Further, whether the harmlessness of an error is certain or seriously debatable will depend not only on the record in each case but also on the applicable legal standard for harmlessness.  As to a judgment of guilt, we evaluate the harmlessness of state law error under *People v. Watson* (1956) 46 Cal.2d 818, 836–837, which requires the defendant to demonstrate a reasonable probability that the outcome would have been different absent the error.  (See *People v. Lucas* (2014) 60 Cal.4th 153, 263.)  Because the burden of persuasion falls on the defendant, and because the reasonable probability standard requires a substantial showing of prejudice, we may expect that courts not infrequently can find harmlessness under this standard to be clear beyond serious debate, despite the government's failure to address the issue.

By contrast, we have long held that the standard for assessing the effect of state law error in the penalty phase of a capital trial is " 'the same, in substance and effect,' " as the standard set forth in *Chapman v. California* (1967) 386 U.S 18 (*Chapman*) for assessing the effect of federal constitutional error.  (*People v. Nelson* (2011) 51 Cal.4th 198, fn. 15; see *People v. Cowan* (2010) 50 Cal.4th 401, 491; *People v. Dykes* (2009) 46 Cal.4th 731, 786; *People v. Ochoa* (1998) 19 Cal.4th 353, 479; *People v. Brown* (1988) 46 Cal.3d 432, 448 (*Brown*).)  The

23

*Chapman* standard requires the beneficiary of the error — the government — to show that the error was harmless beyond a reasonable doubt. (*Chapman*, *supra*, 386 U.S. at pp. 23–24.) In adopting this standard for assessing prejudice from state law error in capital sentencing, we suggested it was constitutionally required: "When the 'result' under review is such a normative conclusion based on guided, individualized discretion, the *Watson* standard of review is simply insufficient to ensure 'reliability in the determination that death is the appropriate punishment in a specific case.' (*Woodson v. North Carolina* (1976) 428 U.S. 280, 305 (plur. opn.); accord, *Satterwhite v. Texas* (1988) 486 U.S. 249, [263]; *Caldwell v. Mississippi* [(1985)] 472 U.S. 320, 329–330; *Zant v. Stephens* [(1983)] 462 U.S. 862, 884–885.)" (*Brown*, at p. 448.)

The government's burden under *Chapman* is perhaps best understood not as a burden of proof but as a burden of persuasion. (See *O'Neal v. McAninch* (1995) 513 U.S. 432, 436–437.) In that sense, a forfeiture does not mean that the government automatically loses under *Chapman*. But the reasonable doubt standard, along with the allocation of the burden of persuasion to the government, suggests that only in limited circumstances can a reviewing court find an error harmless under *Chapman* when the government forfeits the issue. Such a finding "requires a double level of certainty: we must be convinced that the error was 'harmless beyond a reasonable doubt' and that 'satisfaction of that standard is beyond serious debate.' " (*Brooks*, *supra*, __ F.3d at p. __ [2014 U.S. App. LEXIS 22217, at p. *2], quoting *Pryce*, *supra*, 938 F.2d at p. 1348 (lead opn. of Williams, J.).)

### C.

The approach I have proposed is supported by substantial authority and sensibly accommodates concerns of accuracy, efficiency, and fairness. It also has another virtue that counsel for Grimes observed at reargument. When a criminal

24

defendant has forfeited a claim, the defendant is permitted to argue, typically in a habeas corpus petition, that the forfeiture resulted from deficient performance of counsel and that counsel's deficient performance was prejudicial. Thus, our adversarial system of justice does not entirely foreclose relief in the event of a forfeiture. But a defendant's forfeiture unquestionably raises the bar for obtaining relief, as neither deficient performance nor prejudice is easily demonstrated in the context of an ineffective assistance of counsel claim. (See *Strickland v. Washington* (1984) 466 U.S. 668, 689 ["a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance"]; *In re Champion* (2014) 58 Cal.4th 965, 1007 [defendant must show " ' " 'a reasonable probability . . . that, but for counsel's failings, the result would have been more favorable' " ' "].) The proper approach to the government's forfeiture of harmless error is similar. It does not foreclose affirmance on the basis of harmless error, but it does require the reviewing court to find harmlessness under the applicable standard to be clear beyond serious debate. The rough symmetry with claims of ineffective assistance of counsel underscores the fairness and prudence of this approach.

## IV.

I now apply the principles above to the case before us. As to whether the exclusion of Morris's statements was prejudicial at the guilt phase, I begin by noting that at trial Grimes did not dispute his liability for felony murder. The only contested issue was his eligibility under Penal Code section 190.2 for the death penalty or life in prison without parole. Because Grimes was not the actual killer (cf. *id.*, § 190.2, subd. (b)), he was eligible for these penalties only if the jury found that he participated in the underlying felony with the intent to kill (*id.*, § 190.2, subd. (c)) or with reckless indifference to human life (*id.*, § 190.2, subd. (d)). The prosecutor presented both theories to the jury. But because a true

25

finding was needed only as to one theory, and because the evidence was much stronger with respect to reckless indifference, the latter theory was, as defense counsel said in closing argument, the "real issue" in the case. Moreover, a finding of Grimes's intent to kill Bone would necessarily subsume a finding of his reckless indifference to her life.

Grimes argues that the excluded statements were necessary to rebut Jonathan Howe's testimony that Grimes said he (Grimes) had ordered Morris to kill Bone. But the prosecutor did not rely on Howe's testimony in arguing that Grimes acted without regard for Bone's life. Instead, she relied on the overwhelming and uncontradicted evidence that Grimes knowingly helped break into an occupied house in the middle of the day, that he was accompanied by two people he knew to be armed, that he had to step over Bone's unconscious body in order to enter the house, and that he proceeded to search her house for things to steal while overhearing her brutal murder. This evidence of reckless indifference is not undermined by the excluded statements, which concern Grimes's physical location during the murder, his lack of participation in the killing, and his reaction immediately following the murder. Indeed, Grimes does not argue that the excluded statements counter the reckless indifference theory. Even if the erroneous exclusion of Morris's statements under Evidence Code section 1230 amounted to federal constitutional error, it is clear beyond serious debate that the error was harmless as to Grimes's guilt of special circumstance murder.

As to the penalty phase, however, I reach a different conclusion. In deciding between death and life without parole, a jury must take into account the totality of the circumstances of the crime as well as the defendant's "character, background, history, mental condition and physical condition." (Pen. Code, § 190.3.) "[D]etermining the balance of evidence of aggravation and mitigation and the appropriate penalty do not entail the finding of facts but rather 'a single

26

fundamentally normative assessment . . . .' " (*People v. Merriman* (2014) 60 Cal.4th 1, 106.)

In this case, all sides agree that Grimes did not personally kill Bone. Although the high court has held that the federal Constitution does not prohibit capital punishment for a defendant who did not actually kill (see *Tison v. Arizona* (1987) 481 U.S. 137; *Enmund v. Florida* (1982) 458 U.S. 782), such death sentences are not common. Among the nearly 1,400 executions in the United States since 1976, only 20 involved a capital defendant who did not actually kill, and that number includes persons who acted with an intent to kill. (See Death Penalty Information Center (Nov. 19, 2014) *Executions by Year Since 1976* <http://www.deathpenaltyinfo.org/executions-year> [as of Jan. 5, 2015]; *id*., *Those Executed Who Did Not Directly Kill the Victim,* <http://www.deathpenaltyinfo.org/those-executed-who-did-not-directly-kill-victim> [as of Jan. 5, 2015].) This low rate is not a recent development. (See *Enmund*, at pp. 794–795 [among the 362 executions since 1954, 339 involved a defendant who "personally committed a homicidal assault," two involved a defendant who "had another person commit the homicide for him," six involved "a nontriggerman felony murderer," and 16 involved facts "not reported in sufficient detail to determine whether the person executed committed the homicide"].) Whether due to determinations of culpability made by legislatures, by prosecutors, or by juries, the death penalty has rarely been applied to persons who did not actually kill, even if they had an intent to kill.

Given this context, it is reasonable to think that the jury's determination of whether Grimes deserved the death penalty turned significantly on whether he played a leadership role in the killing and what his attitude or reaction to the killing was. And much of that depends on the credibility of a single witness, Jonathan Howe. Although today's opinion says that Morris's statements did not

27

directly contradict Howe's testimony (maj. opn., *ante*, at pp. 36–38), that is not the same as saying that Morris's statements could not reasonably have led the jury to doubt Howe's credibility or to reject the most damning inferences from his testimony.

For example, Howe testified that Grimes said that he had "enjoyed watching" the killing or that he "enjoyed the fact she died." Evidence that Grimes expressed alarm or surprise at the killing ("what in the hell are you doing?") is not inconsistent with Howe's account; Grimes could have enjoyed the killing even though he was surprised by its brutality. But it would have been perfectly reasonable for a juror to draw the opposite inference, i.e., that Grimes's look of surprise cast doubt on Howe's account and, in turn, Howe's overall credibility. Morris's statements tended to shift culpability away from Grimes, and a reasonable juror could have inferred that Grimes, instead of enjoying the killing, retained enough humanity to be shocked by its brutality. Although Howe's testimony that Grimes "enjoyed" the killing evokes Grimes's depravity, the excluded statement that Morris made to Abbott could reasonably have led one or more jurors to doubt this testimony.

Similarly, although the jury could have reasonably believed Howe's testimony that Grimes said he (Grimes) ordered Morris to kill Bone, the jury also could have reasonably doubted this aspect of Howe's testimony in light of Morris's statements to Abbott and Lawson that Grimes took no part in the killing as well as Morris's statement to Lawson that Grimes was "in some other place in the house" during the killing. Notably, Morris made these statements without ever mentioning that he was following Grimes's lead, that Grimes took an interest in the killing, or that the killing was in any way a joint undertaking. Moreover, evidence that Grimes did not supervise the actual killing and was not in the same room when it occurred could have led one or more jurors to infer that *even if*

28

Grimes did order the killing, he was not resolutely murderous but somewhat indifferent to whether the killing was actually carried out (consistent with the reckless indifference theory of his guilt). Because Grimes did not himself kill the victim, it is reasonable that the jury would have paid especially close attention to the precise details of his involvement. The excluded statements would have provided additional nuance for the jury to consider.

Today's opinion does not suggest that Abbott or Lawson would not have been credible witnesses, that Howe's testimony was unimportant to the penalty determination, or that the aggravating evidence was so overwhelming that the jury would have voted for death whether or not it believed Howe's testimony. The penalty phase of this trial consumed 11 days and involved some 25 witnesses, resulting in thousands of pages of record material on top of the voluminous record of the four-week guilt phase. The prosecution introduced evidence of Grimes's criminal history and the impact of Bone's murder on her family. The penalty phase also included a mass of contested evidence concerning childhood abuse suffered by Grimes and its ongoing psychological and neurological effects, Grimes's tendency to be a follower in social situations, his limited mental capacity, and various acts of kindness Grimes showed toward vulnerable people in his life. In addition, the defense and prosecution vigorously disputed whether Grimes expressed genuine remorse after the killing. In closing argument, the defense argued that Howe's testimony lacked credibility, to which the prosecutor responded by saying, "They've never given you a reason to doubt his testimony." The excluded statements by Morris would have enabled the defense to fill this gap.

Having reviewed this lengthy and complex record, I cannot say with confidence that the jury would have voted against death if the trial court had admitted Morris's statements. But more importantly, I cannot say with confidence that the jury would have voted *for* death if the trial court had admitted Morris's

29

statements. In this case, where the jury had to assess the culpability of a defendant who did not personally kill, the penalty issue was hardly clear-cut. Grimes's briefing discussed at length why the erroneous exclusion of Morris's statements was not harmless beyond a reasonable doubt. The Attorney General offered no response. Because the harmlessness of the error is seriously debatable — indeed, it is open to reasonable doubt (see conc. & dis. opn. of Werdegar, J., *ante*, at pp. 4–5) — I would not find the error harmless at the penalty phase. To the extent the issue is close, the risk of an inaccurate determination must fall not on the party who properly and carefully litigated the issue, but on the party who bears the burden of persuasion yet did not address the issue.

*       *       *

In sum, the trial court erred in excluding Morris's self-inculpatory statements to Abbott and Lawson. Although I would affirm Grimes's conviction of special circumstance murder despite the error, I respectfully dissent from the court's affirmance of the penalty verdict. In all other respects, I join the court's opinion.

**LIU, J.**

**I CONCUR:**

**ZELON, J.**<sup>*</sup>

---

\*     Associate Justice of the Court of Appeal, Second Appellate District, Division Seven, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** People v. Grimes

_____

**Unpublished Opinion**
**Original Appeal** XXX
**Original Proceeding**
**Review Granted**
**Rehearing Granted**


_____

**Opinion No.** S076339
**Date Filed:** January 5, 2015

_____

**Court:** Superior
**County:** Shasta
**Judge:** Bradley L. Boeckman


_____

**Counsel:**

James M. Fahey and Cliff Gardner, under appointments by the Supreme Court, Catherine White and Lazuli Whitt for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Ward A. Campbell, Stephanie A. Mitchell and Sean M. McCoy, Deputy Attorneys General, for Plaintiff and Respondent.

Michael J. Hersek, State Public Defender, Barry P. Helft, Chief Deputy State Public Defender, and Nina Rivkind, Deputy State Public Defender, for the Office of the State Public Defender as Amicus Curiae.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Cliff Gardner
1448 San Pablo Avenue
Berkeley, CA  94702
(510) 524-1093

Stephanie A. Mitchell
Deputy Attorney General
1300 I Street, Suite 125
Sacramento, CA  94244-2550
(916) 323-8044